# Hartman *v.* Hyman & Lieberman, Appellants.

*Slander—Trade slander—Privileged communications—Due care —Negligence—Statements to a credit association.*

1. Where an association is organized for the purpose of enabling its members to determine, from statements communicated by the other members, whether or not they will extend credit to those desiring to purchase goods, the one supplying such information to the association, for distribution among his fellow members, cannot escape liability on the ground that his communication was qualifiedly privileged, if it was in fact false and harmful, and was sent for the purpose of coercing payment of a debt alleged to be due.

2. A privileged communication is one made upon a proper occasion, from a proper motive, in a proper manner and based upon reasonable or probable cause.

3. The immunity of a privileged communication is an exception to the general law of liability for slander or libel; hence he who relies upon the exception must prove all the facts necessary to bring himself within it.

4. Want of reasonable care and diligence to ascertain the truth, before giving currency to an untrue communication, will destroy the privilege alleged to arise by reason of the circumstances under which it was spoken or written.

5. Unless the facts of a case undeniably establish that an untrue communication was privileged, the question of the liability of its publisher must be submitted to a jury for its determination.

6. One who knowingly deals with an agency which may cause harm to others, unless care is exercised, will be held liable in damages for the results flowing from a negligent failure to exercise such care. The extent of the care required under such circumstances is proportioned to the likelihood of harm arising from the failure to exercise it.

Argued May 12, 1926.   Before Moschzisker, C. J., Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ.

Appeal, No. 222, Jan. T., 1926, by defendants, from judgment of Superior Ct., Oct. T., 1925, No. 220, affirming judgment of C. P. No. 2, Phila. Co., Sept. T., 1923, No. 343, in case of J. Hartman Co., Inc., v. Charles Hy-

man and Harry Lieberman, trading as Hyman & Lieberman.   Affirmed.

Appeal from Superior Court.

The opinion of the Supreme Court states the facts.

*Error assigned* was judgment of Superior Court, quoting it.

*Ruby R. Vale,* with him *Robert B. Greer* and *Herman N. Schwartz,* for appellants.—The exact question involved in the case has been decided by the Supreme Court of Pennsylvania in a case involving the same association as the instant case and under similar facts, and this precedent has been followed by the Court of Common Pleas, No. 3, of Philadelphia County in a case also involving the same association, under similar facts, and has been subsequently approved by the Supreme Court and by Pennsylvania text-book writers: McIntyre v. Weinert, 195 Pa. 52; Zolyan v. Clayberger, C. P. No. 3, Phila. Co., June T., 1917, No. 3136, not reported; McDonald v. Lee, 246 Pa. 253; 3 T. & H. Pr., p. 2253, by Dr. Bolles and Judge KIRKPATRICK.

The conclusion reached by the court below is contrary to all the cases in other jurisdictions.

A harmful, incidental effect or result in the lawful performance of a legal act does not constitute a tortious wrong: Scott v. Pittsburgh, 266 Pa. 52.

*Robert F. Jackson,* with him *Harold B. Beitler,* for appellee.—Defendants were guilty of publishing words actionable per se: Wood v. Boyle, 177 Pa. 620; Hayes v. Press Co., Ltd., 127 Pa. 642; the communication was not qualifiedly privileged.   Weston v. Barnicone, 175 Mass. 454; Elkington v. London Ass'n., 28 Times L. Rep. 117; Taylor v. Church, 8 N. Y. 452.

OPINION BY MR. JUSTICE SIMPSON, June 26, 1926:

In its petition for an appeal to this court, defendants' counsel strenuously contended that, if our opinion in

McIntyre v. Weinert, 195 Pa. 52, had been followed by the Superior Court, it would have entered a judgment non obstante veredicto in his clients' favor, instead of affirming the judgment for plaintiff; and that a failure to follow it "results in two divergent lines of authority in Pennsylvania with......the consequent necessity for balancing a recent decision of the Superior Court against the law as announced" by us in that case. It was only because earnest, able and conscientious counsel so asserted, that we allowed the appeal. Recognizing this, in the opening sentence of his printed argument he passes over all minor matters occurring at the trial, and limits himself to the question of "the nature of the communication." To this, and the effect of the evidence bearing on it, we shall accordingly limit this opinion.

The action is for slander of trade. The relevant facts, which are not disputed, will be quoted from the opinion of the Superior Court, Hartman v. Hyman, 87 Pa. Superior Ct. 358: "Defendants and other wholesale produce dealers are members of the Philadelphia Produce Credit and Collection Bureau......Defendants had among their customers the plaintiff company [J. Hartman Co., Inc.], which carries on a retail produce business in the Reading Terminal Market in Philadelphia, and also another customer by the name of Hartman, whose place of business was in Trenton, New Jersey. The latter was indebted to defendants in the sum of $216.25. On Wednesday, July 25, 1923, defendants telephoned to the bureau......[and,] later in the day, defendants sent to the secretary of the bureau written notice that 'J. Hartman—*Terminal Market*' was delinquent in its account with them in the sum of $216.25, although in fact plaintiff was not indebted to defendants. On the same evening there was delivered to each member of the bureau, by messenger, notice of the report received from defendants about plaintiff, with the result that when the president of plaintiff company went the next day to make his customary purchases, he was informed by

members of the bureau, from whom he desired to purchase produce, that his name was on the 'black list' and that he could not purchase any goods on credit. Not being prepared to buy for cash he was unable to obtain any produce that morning and could not supply his customers that day."

At this time, the bureau had 137 members. One of its charter purposes was "to furnish information to members to enable them to regulate credits and collect debts." Its by-laws provided that all sales by members "shall be due and payable on the Saturday next succeeding such sales"; that if the account is not "paid on or before 12 o'clock noon of the succeeding Wednesday, the person or firm owing such account shall be reported by 2 p. m. of the same Wednesday to the Secretary" as a delinquent debtor; that a "failure to report overdue accounts by 2 p. m. as above provided shall subject the members so failing to a fine"; that the secretary, upon receipt of such notice, "shall tabulate the names of such debtors, and cause to be furnished a sufficient number of such lists of debtors to supply each member of the bureau with a copy thereof"; that, upon receipt of such a list, every member must "refuse to sell on credit to any person or firm reported as a debtor, or any branch house thereof, until duly notified by the secretary of the payment by him or them of the accounts due the several members of the bureau"; that "the payment of an account due any member of the bureau, shall not entitle the member to sell goods on credit to said debtor, until the member has reported the account 'Paid' and has received from the secretary notice that said debtor has been removed from the debtor list"; and that if a member does not comply therewith he shall be "subject to a fine of $5 for each offense, or upon repetition to expulsion at the discretion of the credit committee."

It will be noticed that those provisions are as inelastic as it is possible to make them. Though a member and his customer have had satisfactory dealings for many

years, any delay in payment, however trivial and whatever the cause, must result in placing him on a delinquent debtor's list, all the members must be advised of the fact at once, all of them must refuse him any credit, no matter what their own knowledge may be as to his standing, and the other members are required so to do without themselves making any inquiries on the subject. They must take the secretary's notice, based solely on the information he receives from their fellow-member, as absolute verity, and must refuse all credit even though every member of the bureau knows that the delay in payment resulted from an injury to or sickness of the customer, from death in his family, from a robbery which took all his ready funds, or from the exercise of that neighborly charity which we are enjoined to bestow upon others in sickness or distress. None of these things can avail as against this rigid plan, devised and carried on to enable the members "to *collect debts*" due to them. If the bureau, as the promulgator of the slander, were the defendant in this action, we might be required to consider whether or not its agreeing to, and actually disseminating it, without making any inquiry of the one who might be greatly injured thereby, would not be sufficient to leave the question of its liability to a jury.

The bureau is not the defendant, however. The present defendants are the authors of the slander, and there is nothing in the by-laws, drastic and rigid as they are, which would have prevented defendants from making inquiries of plaintiff, before they initiated the slander. A telephone call would have elicited the truth and avoided the damage done; but they made no attempt to communicate with plaintiff. An inspection of their own books would likewise have disclosed the falsity of the notice they were about to send to the bureau; but they made no such examination. Apparently they were careless of the harm they might inflict, their one thought being to put in motion the machinery of the bureau that they might, by its means, collect the debt they untruth-

fully asserted plaintiff owed them. Yet they tell us that "if there were any fact in evidence, showing an act on the part of the defendants to coerce the plaintiff into the payment of the debt, that the case would have to go to the jury, and this because self-interest would destroy the privilege and supply the element of actual malice." The "facts in evidence" from which the jury could properly have found, and doubtless did find, that the collection of their debt was one of the ends defendants had in view, when they sent the notice to the secretary of the collection bureau, was that they joined the bureau, knowing that this was one of its main purposes and that its by-laws were drastically framed to accomplish that purpose. Presumptively, at least, all the notices sent in accordance with the by-laws,—including those involved in the present proceeding,—were so sent in order that the senders should receive the benefit intended, that is "to enable them to......collect debts." We are not willing, however, to decide this case solely on that admission of defendants, though the weight of authority (as shown in the opinion of the learned president judge of the common pleas: J. Hartman Co., Inc., v. Hyman & Lieberman, 6 Pa. D. & C. 187) bears out the view stated therein; and we turn, therefore, to a consideration of the case, entirely aside from the point involved in the admission.

It has often been said that a privileged communication is one made upon a proper occasion, from a proper motive, in a proper manner and based upon reasonable or probable cause: Conroy v. Pittsburgh Times, 139 Pa. 334; Wallace v. Jameson, 179 Pa. 98; McGaw v. Hamilton, 184 Pa. 108. The immunity of a privileged communication is the exception, and he who relies upon an exception must prove all the facts necessary to bring himself within it: Collins v. The Morning News Co., 6 Pa. Superior Ct. 330; Mulderig v. Wilkes-Barre Times, 215 Pa. 470; Montgomery v. New Era Printing Co., 229 Pa. 165; McGeary v. Leader Publishing Co., 52 Pa. Su-

perior Ct. 35. Want of reasonable care and diligence to ascertain the truth, before giving currency to an untrue communication, will destroy the privilege: Clark v. North American Co., 203 Pa. 346, 351; Collins v. Morning New Co., supra; McGeary v. Leader Publishing Co., supra; Com. v. Costello, 1 Pa. Dist. R. 745, 747, per ENDLICH, P. J. In Briggs v. Garrett, 111 Pa. 404, 414, it is said: "We are met here with the inquiry, is falsehood privileged? I answer no. A lie is never privileged. It always has malice coiled up within it. When a man coins and utters a lie, or when he repeats it knowing it to be false, the law implies malice and he cannot shelter himself behind the doctrine of privileged communications." It is true, in that case the nonsuit was sustained by a bare majority of this court; but this was because the defendant was not the author of the libel,—it being several times said that the doctrine relied on to sustain the judgment would not apply to the author of the libel. Here, defendants are the authors.

When the principles above stated are applied to the facts of the instant case, there can be but one answer to the contention made in this appeal. Knowing the serious effect of the charge made against plaintiff, and intending that he should be deprived of all credit until he paid the bill alleged to be due, defendants sent the communications upon which the suit is founded. They had neither reasonable nor probable cause for asserting that defendant owed them any money, as was necessary for the proofs to show if the privilege relied on was to be applied in their favor. An examination of their own books, or an inquiry of plaintiff, would have disclosed that it owed them nothing. Defendants were in business in Philadelphia, as plaintiff had been also for some thirteen or fourteen years. So far as this record shows, neither defendants nor any other member of this bureau, had ever had reason to complain of plaintiff's failure to pay promptly. Hence, defendants' good faith and care were, under such circumstances, matters for the jury's con-

sideration, and to that tribunal they were left, the trial judge, saying: "If you believe, in fact, that there was no malice or that there was no reckless carelessness, no reckless negligence, no careless dealing to such an extent as showed they did not care much what they did with their customer's reputation, there would be no liability." This was certainly as far as he was required to go, and the verdict for plaintiff establishes, therefore, that defendants' attempted explanation was not believed, and that carelessness, and not care, was the cause of the wrong done.

But, we are told, McIntyre v. Weinert, supra, is an express authority against the conclusion thus reached. This, however, is a mistake. There, as here, the action was upon a writing which impeached the credit of plaintiff, by imputing to him business embarrassment; but at this point the similarity ends. In the statement of claim in that case it was expressly alleged that the writing was malicious, yet defendant demurred, thereby admitting the truth of that averment. The court below sustained the demurrer and entered the judgment for defendant, from which the appeal was taken. The relevant language of our opinion is as follows, (195 Pa. 57): "Where the defendant and the person addressed have corresponding interests in the subject-matter of the communication, it *may* be privileged. This privilege, however, is not absolute. It will not avail the defendant, if, under the evidence submitted, the jury find that he was actuated by malice in making the communication......The plaintiff avers that the writing was malicious, and on this demurrer, of course, the question cannot be determined, but the cause must be sent back to a jury." We did not decide whether or not the communication there in suit was in fact privileged, but only set forth a certain state of facts, from which, if they existed, the communication referred to *"may* be privileged." Of course, also, nothing appeared there, as it does here, to show that there was no reasonable or probable cause for the communi-

cation, which was sent with such a total absence of care as to indicate indifference regarding the harm it might inflict on plaintiff.

What we have said disposes of all the points necessary to be considered by us in the instant case; but, in order to avoid misapprehension, it may not be amiss to say that we do not consider this character of association to be illegal. On the contrary, we decide that it is legal, and, if its by-laws are reasonable and the association is properly conducted, it tends to benefit its members and indirectly the community also. What we do say is, that every member of this particular association is bound to know of the possible far-reaching effect which may result from placing the name of a trader on its delinquent debtor's list, and of sending that list to a large number of the persons from whom the trader purchases the goods needed by him in carrying on his business; and hence where, as under the plan of this bureau, the alleged delinquent is to be given no opportunity by it to deny the charge, and his past reputation is to be given no weight, every member is required to exercise great care before he sends in a name to be placed on such a list. If he does not he may make himself liable for the wrong done. This is precisely the rule which the law applies under all legally similar circumstances. He who knowingly deals with an agency which may cause harm to others, unless care is exercised, must answer for the results which flow from a negligent failure to exercise such care; and the extent of the care required is proportioned to the likelihood of harm flowing from a failure to exercise it.

Judgment affirmed.