Williams, Appellant, *v.* Kroger Grocery & Baking Company.

Wells, Appellant, *v.* Kroger Grocery & Baking Company.

2

Argued May 5, 1938.

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES,
JJ.

*Samuel G. Wagner,* with him *Leo A. Nunnink,* for
appellants.

*Carl E. Glock,* with him *Reed, Smith, Shaw & McClay,*
for appellee.

OPINION BY RHODES, J., September 28, 1938:

These two actions of trespass for slander were tried
together in the court below because the proofs in both
cases were so closely connected, and they will be con-
sidered in one opinion by this court for the same rea-
son. The trial resulted in a verdict of $500 for each
plaintiff, but subsequently the court entered judgments

for defendant n. o. v., and plaintiffs have appealed.

Appellant Wells was employed by appellee in the banana department in its warehouse at Pittsburgh. Appellant Williams was engaged in hauling rubbish from appellee's stores and warehouse under written contract. Although it was customary for Wells to leave the warehouse on Saturday about 2 P.M., he testified that he was told to work on the Saturday afternoon in question because of the opening of a new store. He returned from lunch about 1:15, and from then until about 2 P.M. engaged in conversation with another employee while the latter was working and until the occurrence hereinafter related took place. Wells testified that at that time Mr. Lindsay, superintendent of the warehouse, came rushing from the front part of the building, and said in a loud voice, "Where is that box of butter you gave Mr. Williams?" Wells said, "You must be crazy." Lindsay replied, "You have got it and you know you got it." Lindsay then went outside and examined Williams' truck, which was loaded with refuse from the warehouse, and finally decided to go to the dump in order to examine the contents as they were unloaded. Wells remained at the warehouse, and when Lindsay returned said to him, "Well, Mr. Lindsay, did you find anything?" Lindsay replied, "It wouldn't do you a damn bit of good whether I did or not; you are done." Williams heard Lindsay accuse Wells of stealing the butter. The conversation took place five or six feet from the banana table, at which time Williams was at a doorway about seven feet from the banana table.

Williams testified that while he was waiting for his men to complete loading the truck and start for the dump, Lindsay walked outside and began to search the truck. Williams asked him what he wanted, and Lindsay said, "You know damned well what I want." Williams said, "I don't know." Lindsay said, "Where is

that case of butter that Wells stole out of the cooler and gave to you? ...... You know damn well the thing's on here; you might as well own up to it." Rather than delay the truck by taking the load off at the warehouse, Lindsay decided to follow it to the dump and examine the load there. At the dump Lindsay waited while the truck was unloaded, and after it was unloaded he said to Williams, in the presence of the latter's driver, "Now, you know damn well where that case of butter is, you and Wells stole out of the warehouse." Lindsay also said that if Williams wanted his contract he would have to replace the box of butter that Wells and he had stolen. According to Williams, Lindsay said to the man in charge of the dump, "This fellow has thirty pounds of butter on here and I want to find it." Williams also corroborated the testimony of Wells to the effect that Lindsay's accusation against Wells was made in the hearing of Williams.

The foreman employed at the incinerator or dump verified the visit of Lindsay, but did not testify to any utterance by him.

Booker, who was employed by Williams at the time as a truck driver, testified that Lindsay and two others inspected the truck, and testified also to several versions of what Lindsay said to Williams at the dump. On direct examination he said that Lindsay's remark was, "You will lose your contract until you find this butter which was stolen from the warehouse and was given to you by Harry Wells." On cross-examination he testified as follows: "Q. Out at the dump, Mr. Booker, you say you heard Mr. Lindsay [say] to Mr. Williams, 'You lose your contract until you find this butter which was given to you by Harry Wells'? Is that right? A. Yes. ...... Q. Is that what you said? A. What? Q. 'You will lose your contract until you find this butter which was given to you by Harry Wells'? A. 'The butter you stole from—that was given

to you by Harry Wells' or, 'The butter you stole that was given to you by Harry Wells.' Q. Was he accusing Williams? A. Williams and Harry Wells both. Q. Tell the jury just what was said there? A. 'You lose the contract until you find the butter that was stolen from the warehouse by you and Harry Wells, that was given to you by Harry Wells.' "

At the conclusion of appellants' case, appellee moved unsuccessfully for nonsuits on the ground that appellants' proof showed that appellee acted under qualified privilege, and that there was no evidence of malice to take the case to the jury.

Chaplicki, who at the time of the trial was a district manager for appellee, but at the time of this occurrence was branch manager in Pittsburgh, testified that on September 24, 1934, he received through the mail an anonymous letter, which suggested that Wells and Williams were combinedly engaged in stealing goods from appellee's warehouse, and suggesting a check-up in the Saturday noon clearing of rubbish from the warehouse. At that time the witness did not know who wrote the letter, although later it was discovered that it was written at the direction of one Atkins who testified for appellee. Chaplicki said that for five or six weeks previously there had been excessive shortages of butter, cheese, and canned meats. Upon receipt of the letter he arranged with Lindsay to watch the warehouse on Saturday. Chaplicki did not participate in the watching. That was done by Lindsay, who testified that on the Saturday in question, about 11:50 A.M., he placed himself on top of a cooler overlooking the cutting table, the banana department, and the butter cooler. At that time there was no one around. The rubbish truck arrived between 12 and 1 o'clock. He testified that although he had designated no duties for Wells that afternoon, he later saw him enter the room and pick up an orange or lemon crate and place it on his

cutting table. Then he secured a burlap sack, after which he went into the butter cooler and came out with a box of butter. He put the box of butter in one side of the orange crate and put the burlap sack on top of it. He then pushed it across the table to Williams, who was waiting at the other side, and he took it out the door. Before entering the butter cooler Wells extinguished the light. Lindsay made no outcry at the moment, but went back through the building and down to the first floor to the loading platform where Williams' truck was standing. He began to examine the truck, and when Williams asked him what he was looking for he said, "You know damned well what I am looking for." It had required about three minutes to go from his place of observation to Williams' truck. Williams was standing in the doorway of the warehouse, and Lindsay testified that he walked in and said, "Harry, come here," and they walked into the warehouse about thirty feet back from the door, and then Lindsay said, "What did you do with that box of butter you took from the cooler?" Lindsay testified that he then accompanied the truck to the dump, and watched it being unloaded and found no butter. He admitted saying to Williams at the time that, if he wanted his hauling contract, he had better tell where the butter was. He also admitted saying to Wells, upon his return to the warehouse and being asked whether the butter had been found, "It won't make any difference to you whether I found any butter or not; you're through."

The testimony indicates that Wells returned to work on Sunday despite his discharge on Saturday afternoon, and that he came again for work on Monday morning. On Monday morning he complained to Chaplicki, who called in Lindsay. In the presence of Chaplicki and Wells, Lindsay said, "We have been looking for George Williams, the man who hauls the trash. I am surprised at you, Harry; we never suspected until we caught you

stealing this box of butter Saturday afternoon." Wells further testified that at the same time Chaplicki said, concerning Williams, "We're also laying for George Williams, the rubbish man. There has been a lot of butter going from the warehouse. We know Williams was stealing it, but we are surprised to find you were implicated with him."

Both appellants denied vigorously that they had stolen the butter, and asserted that they had nothing to do with it.

The principal contentions of appellee are (1) that the alleged slanderous statements were privileged; and (2) that it was incumbent upon appellants to prove malice which they failed to do. Appellants contend that since the words spoken imputed indictable crimes, and the circumstances tending to show privilege depended upon oral testimony produced by appellee, the case was for the jury, and that it was error for the court to enter judgments for appellee n. o. v. Secondarily, appellee argues that there was no proof of publication of the alleged slander.

The defamatory utterances [1] complained of by appellants charged indictable offenses, and were actionable per se. *McGaw v. Hamilton,* 184 Pa. 108, 39 A. 4. See *Conroy v. Pittsburgh Times,* 139 Pa. 334, 21 A. 154. In

---

[1] "The word 'slander' is the general and original word for all kinds of defamation, and at an early day in the history of the common law the term applied both to oral and written defamations of character. In this sense it has been defined to be the defaming of a man in his reputation by speaking or writing words from whence any injury in character or property arises, or may arise to him of whom the words are used. But in modern usage it has been limited to defamation by words spoken, and in this sense may be defined as the speaking of base and defamatory words which tend to the prejudice of the reputation, office, trade, business, or means of getting a living of another. The original application of the term 'slander' was applied more to words or utterances, the nature of which were defamatory to

granting appellee's motions for judgments n. o. v., the court below held that the remarks came under the protection of the rule of qualified privilege; that there was an absence of evidence of excessive publication to defeat the defense of privilege; and that appellants were not entitled to recover unless they could establish actual malice as the motive of the publication. The opinion of the court below then continued: "Under the facts of the instant case, the expressions here complained of as slanderous, coming under the protection of qualified privilege, actual malice is not shown in any of the record in this case. The communication here made falling within the scope of qualified privilege, the 'question is not the truth or falsity of the communication, or whether the action taken by the defendant with reference thereto or based thereon was right or wrong, but whether the defendant in making the publication acted in good faith or was inspired by malice.' *Montgomery Ward & Co. v. Watson* [55 F. (2d) 184 (C. C. A. 4th, 1932)]."

In this state it has been held that whether a communication is, or is not, privileged by reason of the occasion is a question for the judge alone, where there is no dispute as to the circumstances under which it was made. *McGaw v. Hamilton,* 15 Pa. Superior Ct. 181, 188.

In *Montgomery Ward & Co. v. Watson,* 55 F. (2d) 184, at page 187 (C. C. A. 4th, 1932), it was held:

---

the character of an individual. The term, however, has been applicable to utterances and words made with reference to property, whether real or personal": 36 C. J. §4, p. 1145.

"While at early common law the term 'slander' was used as a general term for all kinds of defamation, in modern usage 'libel' and 'slander' are distinguishable terms; they are not the same, either in all their elementary ingredients or in the penalties attached. Libel is expressed by print, writing, pictures, or signs; slander is expressed orally, and limited to defamation by words spoken": 36 C. J. §5, p. 1146.

"As to the first question, there can be no doubt but that the occasion was one of qualified privilege. ......
Since, therefore, the occasion was privileged and the publication not excessive, plaintiffs are not entitled to recover, unless they can establish actual malice as the motive of the publication." But in Pennsylvania the defense of privilege is an affirmative defense, and, generally speaking, he who relies thereon must prove all facts necessary to bring himself within it. In *Stevenson v. Morris,* 288 Pa. 405, at pages 409, 410, 136 A. 234, at page 235, the rule is stated as follows: "The privilege, in cases of the character here involved, is not absolute, but merely a qualified one, and is no defense, if it in fact appears defendant was actuated by malice in making the statements. It being undisputed that the charge of incompetence on the part of plaintiff was untrue, the burden was on defendant to show the use of reasonable care and diligence to ascertain the truth of the statements contained in his letter before making them (*Hartman v. Hyman,* 287 Pa. 78, 84 [134 A. 486], and cases cited), and establish all facts necessary to bring himself within the rule of privilege (*Hartman v. Hyman,* supra, p. 83, and cases cited), which requires that the communication be one made on a proper occasion, from a proper motive, in a proper manner, and based on reasonable or probable cause: *Conroy v. Pittsburgh Times,* 139 Pa. 334, 338 [21 A. 154]; *McGaw v. Hamilton,* 184 Pa. 108, 114 [39 A. 4]; *Montgomery v. New Era Printing Co.,* 229 Pa. 165, 167 [78 A. 85]; *Wharen v. Dershuck,* 264 Pa. 562, 569 [108 A. 18]; *Hartman v. Hyman,* 287 Pa. 78, 83 [134 A. 486]." The "occasion" is but one of the elements necessary to establish privilege. *Stevenson v. Morris,* supra, p. 410.

As the alleged slanderous words in the instant case charged the commission of indictable offenses, the burden of proving the facts necessary to sustain the claim of privilege was on appellee. *McGeary v. Leader*

*Publishing Co.,* 52 Pa. Superior Ct. 35, 47. In addition to the presumption of appellants' innocence, we have their denial of guilt. Although this is negative, it is difficult to see under the facts what other evidence could have been produced by them. An additional factor was the failure to find the allegedly stolen butter as established by appellants' testimony. The presumption of innocence to which appellants were entitled made it incumbent upon appellee to produce evidence of probable cause for the accusation.

As the defamatory words charged that appellants had committed indictable offenses, they were not only actionable per se, but implied malice (*McGaw v. Hamilton,* supra, 184 Pa. 108, 111, 39 A. 4). Appellants established prima facie cases. The function of malice in slander or libel is to rebut the defense of qualified privilege. The jury could find actual malice from the falsity of the accusations and the want of probable cause (*Neeb v. Hope,* 111 Pa. 145, 154, 2 A. 568). Appellee's position that appellants failed to carry their burden, and that there was nothing to go to the jury, cannot be sustained. Assuming that the occasion supplied one element of the immunity of privilege, and that the privilege was not exceeded by the manner of publication, still it was incumbent upon appellee to prove that it had reasonable or probable cause. *McGeary v. Leader Publishing Co.,* supra. That the occasion was privileged was not alone sufficient to justify groundless accusations of crime. In the McGeary case, supra, at page 48, it was also held: "Probable cause that would justify a publication charging an indictable offense, would justify a prosecution for the alleged crime: *Neeb v. Hope,* 111 Pa. 145 [2 A. 568]; *Briggs v. Garrett,* 111 Pa. 404 [2 A. 513]. It does not depend on the actual state of the case in point of fact, but upon the honest and reasonable belief of the party prosecuting or publishing the charge. It has been defined to be a reason-

able ground of suspicion, supported by circumstances sufficient to warrant a cautious man in believing that the party is guilty of the conduct imputed to him: *Smith v. Ege,* 52 Pa. 419. The probable cause that will warrant belief must be found in circumstances of adequate probative force, lying within personal knowledge or information derived from sources of such a character as to lead a reasonably prudent man to regard it as trustworthy: *Com. v. Swallow,* 8 Pa. Superior Ct. 539. The test is not merely whether the circumstances and information induced such belief in the defendant, but whether they were sufficient to lead a reasonably prudent man to believe the party guilty of the alleged misconduct: *Com. v. Storey,* 49 Pa. Superior Ct. 282."

In this connection appellee's evidence disclosed that there had been shortages of butter in the warehouse; that it had received an anonymous letter specifically accusing appellants of theft, and suggesting a watch on a Saturday noon; that a watch was undertaken by the manager; that the manager witnessed suspicious actions on the part of appellants; that he believed appellants had stolen a case of butter; that an effort was made to find the butter on the truck of one of the appellants but without success; that a check of the butter cooler made that afternoon revealed one case short. It was for the jury to pass on the credibility of appellee's witnesses, and it was not the province of the court to declare that the facts necessary to establish the defense were conclusively established. *McGeary v. Leader Publishing Co.,* supra. The court would not be justified in assuming the truth of such testimony as to probable cause.

Probable cause was an element of appellee's claim of privilege, and whether it had been established by the testimony, which was oral except for the anonymous letter, was for the jury. See *Conroy v. Pittsburgh*

*Times,* supra. The writer of the anonymous letter appeared as a witness for appellee, and within three weeks after the alleged occurrences this witness was engaged by appellee to succeed appellant Williams.

As to the question of publication of the alleged defamatory utterances, we think the evidence was sufficient to warrant the submission to the jury when considered in connection with all the other facts and circumstances of the case.

Judgments are reversed, and the records are remitted to the court below that judgments may be entered on the verdicts in favor of George L. Williams and against defendant (No. 252, April Term, 1938), and Harry Wells and against defendant (No. 253, April Term, 1938).