Mary M. MacRAE
v.
AFRO–AMERICAN COMPANY, a Maryland Corporation.
Civ. A. No. 18822.

United States District Court
E. D. Pennsylvania.
April 3, 1959.

186

Laurence H. Eldredge, Philadelphia, Pa., for plaintiff.

Francis W. Sullivan, Sydney C. Orlofsky, Philadelphia, Pa., for defendant.

GRIM, District Judge.

In this libel action plaintiff has a verdict in her favor in the sum of $50,000 against defendant, a newspaper publisher. Defendant's motion for judgment in its favor or in the alternative for a new trial presents the question now before the court.

A newspaper article in defendant's newspaper in reference to the death of plaintiff's daughter, who was a student at Barnard College in New York City, constitutes the alleged defamatory statement. The article is:

"Lincoln dean's daughter buried.

"Oxford, Pa.—Mary J. MacRae, who died from gas poisoning, was buried Friday from Lincoln University where her father, James B. MacRae, is dean of students.

"Miss MacRae, 19, was found on Wednesday in New York City where she was residing for the summer. She was believed to have been despondent over her mediocre marks at Barnard College.

"It was rumored on the Lincoln campus that her mother, Mrs. Mary MacRae, was extremely displeased over her daughter's scholastic standing. Her father rated her as an 'acceptable student.'

"Mary Jane, it was also whispered, had been told not to come home unless she improved her grades. Mrs. MacRae was so grief stricken that she did not go to the cemetery.

"It has not been determined, however, whether Miss MacRae's death was suicide or accidental. A report from authorities is expected within a week or two, according to Lee R. Reynolds, Philadelphia undertaker, who was in charge."

Defendant's first contention is that as a matter of law the article was not defamatory and that, therefore, the trial judge should not have submitted the case to the jury.

If the article was reasonably capable of a defamatory meaning it was the duty of the trial judge so to determine and then to submit the case to the jury to see whether the article had such a meaning in fact. Restatement, Torts, Sec. 614; Bausewine v. Norristown Herald, 1945, 351 Pa. 634, 643, 41 A.2d 736. The trial judge being of the opinion that the article was reasonably capable of a defamatory meaning submitted the case to the jury.

To determine the meaning of the article it must be read as a whole and each word must be read in the context of all the other words. Restatement, Torts, Sec. 563d. To determine the reasonable meaning of the article "The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute

to them." Boyer v. Pitt Publishing Co., 1936, 324 Pa. 154, 157, 188 A. 203, 204.

Looking at the article in this manner it can fairly be taken to mean that Mary J. MacRae died from gas poisoning, perhaps by suicide, while a student at Barnard College in New York City; that she was doing badly scholastically in college and was despondent about it; that she was also unhappy because her mother was extremely displeased over her poor marks and because someone, probably her mother, had told her not to come home unless her marks improved; that the suicide, if it was that, probably was caused by a combination of all of these things—the poor marks, the mother's extreme displeasure, and the statement that Mary Jane should not come home unless her marks improved. In this interpretation the article means that the mother, the plaintiff in this case, was at least partly responsible for her daughter's death.

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community." Restatement, Torts, Sec. 559. "Words which produce any perceptible injury to the reputation of another are called 'defamatory'." Collins v. Dispatch Publishing Co., 1893, 152 Pa. 187, 190, 25 A. 546, 547. "A 'libel' is a * * * publication * * tending either to blacken the memory of one who is dead, or the reputation of one who is alive, and expose him to public hatred, contempt or ridicule." Sarkees v. Warner-West Corp., 1944, 349 Pa. 365, 37 A.2d 544. Certainly a communication which suggests that a mother had some responsibility for her daughter's death would tend so to harm the reputation of the mother as to lower her in the estimation of the community and would tend to blacken her reputation and expose her to public contempt.

The averments in the article were described as "rumors" and "whispers" instead of facts. Using words like this, however, does not make a statement any less a libel. In a libel action a person is as much responsible for repeating defamatory statements, even though described as "rumor" or "whispers" as he would be for publishing the same averments as statements of fact. Restatement, Torts, Sec. 578, Comment c.

Defendant contends that the words can have an innocent and non-defamatory meaning. For the purpose of argument this may be admitted, but it is of no help to defendant, since the words are reasonably capable of a meaning that is clearly defamatory. The fact that a publication is susceptible of an innocuous interpretation does not defeat the right to damages for libel. Boyer v. Pitt Publishing Co., 1936, 324 Pa. 154, 188 A. 203.

The trial judge acted properly in submitting the case to the jury, and a verdict for the plaintiff is amply supported by the words of the article.

Defendant contends that it was entitled to a conditional privilege. Conditional privilege, if not abused, can be an absolute defense to an action for defamation: Restatement, Torts, Sec. 593. The trial judge ruled during the trial that under the facts in the case the article was not conditionally privileged.[1]

A privileged communication is one made upon a proper occasion, from a proper motive, in a proper manner, and based upon reasonable or proper cause.[2] The immunity of a privileged communication is the exception, and he who relies upon an exception must prove all the facts necessary to bring himself within it. Montgomery v. Dennison, 1949, 363 Pa. 255, 69 A.2d 520; Hartman & Co. v.

1. This was a question for the court: Restatement, Torts, Sec. 619(1); Dempsky v. Double, 1956, 386 Pa. 542, 126 A.2d 915.

2. The question of manner, and reasonable or proper cause did not come up in the present case because of the trial judge's ruling that no proper occasion existed for a conditional privilege. Motive, manner and reasonable cause would have presented questions of fact. No facts were in dispute on the question of proper occasion so that it was a question of law.

Hyman & Lieberman, 1926, 287 Pa. 78, 134 A. 486, 48 A.L.R. 567.

Proper occasions, which give rise to a conditional privilege, are classified by Harper and James, The Law of Torts, pp. 439, 440, Sec. 5.25, as follows: (1) situations in which some interest of the person who publishes the defamatory matter is involved, (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved, and (3) situations in which a recognized interest of the public is involved.

Defendant argues in its brief that it has established by the evidence that this was a privileged occasion of the third type: "The cause of death, and the cause of probable despondency of a person who dies from gas poisoning under circumstances which might point to suicide have classically been the concern of the community." The brief cites no authority for this proposition, nor have I found any. The authorities on this point, few as they are, appear to be to the contrary. "Defamatory comment on the private character of a private person is not privileged, there being no public interest therein," 33 Am.Jur. 158. "There is no privilege to comment on the domestic occurrences of a private household, so long as they do not rise to the magnitude of crimes or breaches of the peace." 33 Am.Jur. 129, 130.[3]

There are many instances of occasions in which public interest gives rise to conditional privilege,[4] but none of them applies to the case at bar. Plaintiff was not a public officer or a candidate, nor was she a person in whom the public had "any interest except that which arises out of idle curiosity and vitiated appetite for the sensational," Oles v. Pittsburgh Times, supra. The fact that she was the wife of a university dean does not make her such a public person as to give rise to conditional privilege where her conduct is concerned.

Since the communication was not made on a proper occasion, it was not conditionally privileged. The fact that defendant is a newspaper publisher does not of itself confer the defense of conditional privilege. Neeb v. Hope, 1886, 111 Pa. 145, 154, 2 A. 568; Barr v. Moore, 1878, 87 Pa. 385, 393. The privilege arises out of the occasion and not out of the nature of the defendant's business.

The trial judge determined correctly that the publication of the article was not conditionally privileged.

Defendant contends that the trial judge did not charge the jury adequately on the question of truth as a defense. Both in the body of the charge and in reading a point for charge submitted by defendant the trial judge charged that truth was a complete defense to the action. Defendant presented no additional points for charge on this subject and took no exception to the charge in reference to it. Defendant now contends, however, that the jury should have been charged that defendant could not be liable if the statements in the article were substantially true.

There was very little, if any, evidence tending to establish the truth of the statements, and the issue of substantial, contrasted with literal, truth was not argued to the jury. If defendant believed itself entitled to a more comprehensive charge on the question of truth or sub-

3. See also Oles v. Pittsburgh Times, 1896, 2 Pa.Super. 130, which held not privileged an accusation that plaintiff's evil influence caused a nervous disorder in another.

4. Restatement, Torts, Sec. 598; Mulderig v. Wilkes-Barre Times, 1906, 215 Pa. 470, 64 A. 636, (comment about a public official); McAndrew v. Scranton Republican Publishing Co., 1950, 364 Pa. 504, 72 A. 2d 780, (comment about a candidate for public office); Morgan v. Bulletin Co., 1952, 369 Pa. 349, 85 A.2d 869, (comment about municipal affairs); Boyer v. Pitt Publishing Co., 1936, 324 Pa. 154, 188 A. 203, (comment about court proceedings); O'Donnell v. Philadelphia Record Co., 1947, 356 Pa. 307, 51 A.2d 775 (comment about a newspaper columnist). In each of these Pennsylvania cases there was a clear public concern about the subject dealt with in the communication.

stantial truth, it should have submitted a precise point for charge covering the matter. The only instance in which defendant used the phrase "substantial truth" in its points for charge was in connection with a point on conditional privilege, and the phrase was used there in such a way that it would have been error on the question of conditional privilege for the court to have affirmed the point. The trial judge committed no error in not charging on the question of substantial truth.

The verdict was for $50,000. In answer to interrogatories the jury stated that this included $20,000 for punitive damages. Defendant contends that the verdict was excessive both as to compensatory and as to punitive damages.

What a jury may consider in awarding damages in a suit for defamation has been set forth in Restatement, Torts, Sec. 569, comment c, as follows:

"The jury may take into consideration any loss of reputation sustained by the other in determining the amount of its verdict. So, too, the recovery may include compensatory damages for any special harm * * * and damages for emotional distress or illness or bodily harm * * *. In a proper case punitive damages may also be included in the recovery."

█ It is very difficult to say what a good reputation is worth or what is a fair compensation for lowering of a mother's reputation when she has been falsely accused of helping to bring about her daughter's suicide. Certainly it would be a substantial figure and a jury would be warranted in so finding. Mrs. MacRae's emotional distress (apart from the distress caused by the death) upon learning of the article was great and caused her to be hospitalized immediately for four days. The distress continued for a long period of time and eventually affected her digestive functions so that she was again hospitalized. The article caused Mrs. MacRae to restrict her social life and to withdraw from activities in which she was interested. The defama-

tory article was spread widely. It was published in newspapers which had a circulation of about 97,000 copies, which went into 33 states. Of these 11,727 went into Pennsylvania and 419 into Chester County, Pennsylvania, where plaintiff lived. The $30,000 verdict for compensatory damages is amply supported by the evidence.

The punitive damage problem was correctly presented to the jury by the trial judge as follows:

"If, in your judgment from your memory of the evidence in the case, the defendant published the alleged defamatory matter with knowledge of its falsity, or with reckless indifference thereto, or solely for the purpose of causing harm to the plaintiff, then you could award punitive damages to the plaintiff."

There is no substantial evidence that the article was published with knowledge of its falsity, or solely for the purpose of causing harm to the plaintiff. Apparently the verdict for punitive damages was based upon the jury's conclusion that the article was published with reckless indifference as to whether or not it was true. The reporter who wrote the story testified that before she wrote the article she telephoned the MacRae residence and spoke to plaintiff's husband but got none of the defamatory information from him. She was told that Mrs. MacRae, the plaintiff, was not available. The reporter obtained all the information used in the article from hearsay on the campus of Lincoln University where there was some rumor to support the story.

█ To publish this untrue story concerning the very personal and delicate relationship between a mother and daughter right after the daughter's funeral was indeed a nasty thing to do, but under the facts a finding that it was done with reckless indifference to its falsity is not substantiated by the evidence. For that reason the verdict will be reduced to $30,000, the jury's verdict for compensatory damages.

It is not often that a trial court is able to change the amount of a jury verdict.

The rule has been stated as follows:

"The courts of this country unanimously hold that the trial court is powerless to reduce the verdict of a jury in an action for unliquidated damages and render judgment for a less amount unless the party in whose favor the verdict was rendered consents to the reduction, since a reduction under such circumstances invades the province of the jury. The court must make the remittitur conditional upon the consent of the plaintiff * * *." 39 Am. Jur. 206.

This rule, however, does not apply in a case such as the present one where as a matter of law a portion of the verdict must be excised and where the jury itself has liquidated the portion of the verdict to be excised. It was within the province of the jury to fix the amount of punitive damages. It did this. Its decision in reference to the amount of punitive damages is not being changed, so its province is not being invaded.

Defendant's motion for judgment in its favor and for a new trial will be denied. The verdict and judgment will be reduced to $30,000.