923 A.2d 389

AMERICAN FUTURE SYSTEMS, INC. d/b/a Progressive
Business Publications, Appellant

v.

BETTER BUSINESS BUREAU OF EASTERN
PENNSYLVANIA and Better Business Bureau
of Metropolitan Washington, Appellee.

Supreme Court of Pennsylvania.

Argued April 3, 2006.

Decided May 31, 2007.

James Howard Steigerwald, Wayne A. Mack, Jr., Duane Morris, L.L.P., Philadelphia, for American Future Systems, Inc. d/b/a Progressive Business Publications, appellant.

Paul D. Weller, Jennifer Beth Jordan, Morgan Lewis & Bockius, L.L.P., Philadelphia, for Better Business Bureau of Eastern Pennsylvania, et al., appellees.

BEFORE: CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## OPINION

Justice SAYLOR.

The primary issues for resolution in this defamation case are whether consumer reporting agencies enjoy a conditional privilege that can only be defeated by showing actual malice, and under what circumstances a corporation can become a limited-purpose public figure by virtue of its advertising and solicitation activities.

Appellant, American Future Systems, Inc., doing business as Progressive Business Publications, publishes specialized "fast-read format" newsletters targeted to career-oriented individuals. These newsletters focus on business-related topics such as sales, marketing, advertising, financial management, business management, human resources, and safety and regulatory compliance. Appellant sells its newsletters through direct mail solicitations and a sales force of approximately 500 telemarketers from fifteen separate offices across the nation, and solicits 15,000 new subscriptions each week. The telemarketers call customers at their place of employment during regular business hours to offer them "no-risk" trial subscriptions to the newsletters. If a customer agrees to the trial offer, the telemarketer obtains the customer's date of birth (excluding year) for verification purposes. According to Appellant, it confirms each order by sending a fax or email to its customer within twenty-four hours after the order.

The trial subscription includes two issues of the newsletter free of charge, but to cancel, the customer must write "cancel" on the first invoice. Invoices are sent monthly and, although they request payment, they do not state the cancellation policy and do not contain Appellant's phone number. If the first invoice is not returned to Appellant with "cancel" written upon it and no payment is immediately forthcoming, Appellant sends a second invoice, not to the customer, but to the accounts payable department of the customer's employer. Consistent with the trial offer, Appellant's policy is to terminate, without further obligation, any subscription for which a cancelled invoice is received within six months after the initial phone call. After six months of non-payment, however, past-due accounts are sent to a collection agency. A typical annual subscription price is approximately $300.00, and ninety-two percent of the subscriptions are cancelled. Appellant has its headquarters in Malvern, Pennsylvania, and is owned by Edward Satell ("Satell"), who retains a 98 percent interest in the company. According to Satell, the company's gross revenues have risen every year and totaled $29 million in 2002.

In 2001, the Better Business Bureau published a report concerning Appellant's sales practices. The report covered a three-year period beginning in 1998, and stated:

> While this company responds to customer complaints presented to it by this Bureau, this company has an unsatisfactory business performance record due to a pattern of customer complaints alleging billing for unordered merchandise. Some consumers have claimed that they cancelled subscriptions but their cancellations were not honored.

Better Business Bureau Reliability Report, March 2001, at 1. The second page of the report contained the following disclaimer:

> As a matter of policy, the Better Business Bureau does not endorse any product, service, or company. [The Bureau's] reports generally cover a three-year reporting period, and are provided solely to assist you in exercising your own best judgment. Information contained in this report is believed to be reliable but not guaranteed as to accuracy. Reports are subject to change at any time.

*Id.* at 2.[1]

Upon learning of the report in early 2001, Satell wrote to the Bureau contesting the report and seeking its retraction. In particular, Satell explained that Appellant records its telemarketers' calls for training purposes, and, because Appellant collects customers' birthdates, it can disprove claims of unordered merchandise. Satell also noted that, in view of the 15,000 new subscriptions received each week, the number of complaints that the Bureau receives is extremely small by comparison.

1. The Council of Better Business Bureaus is comprised of hundreds of separate non-profit corporations nationwide that publish company ratings and help resolve consumer complaints. The Better Business Bureau affiliate serving Appellant's geographical area prior to 2000 was the Better Business Bureau of Eastern Pennsylvania. In October 2000, however, the Better Business Bureau of Metropolitan Washington acquired that organization's assets, assumed its operations, and merged the territories. For convenience, we will refer to Appellees collectively as the Better Business Bureau, or simply, the Bureau.

As a result, the Better Business Bureau updated the report to state:

> While this company responds to customer complaints presented to it by this Bureau, this company has an unsatisfactory business performance record due to a pattern of customer complaints alleging billing for unordered merchandise. Some consumers have claimed that they cancelled subscriptions but their cancellations were not honored. On March 16, 2001, [Appellant] responded to the [the Bureau] concerning the company's unsatisfactory business performance report. The company sells its publications through telemarketing solicitations. It claims that it tape records telephone solicitations for quality control purposes. The company states that it obtains the ordering person's birthdate to verify the order at a later date. According to the correspondence, orders are confirmed by fax within 24 hours, giving the orderer an opportunity to respond. The company claims it has a liberal cancellation policy permitting the customer to cancel anytime within the first three months of the telephone order and receiving a refund on all unsent issues. New subscribers receive two free issues with the right to cancel according to the company. The company claims that its [Better Business Bureau] complaint volume is negligible compared to its volume of business.

Better Business Bureau Reliability Report, April 2001, at 1. The updated report included the same disclaimer contained in the earlier one.

Dissatisfied, and following unsuccessful attempts to resolve the unsatisfactory rating, Appellant filed a defamation action against the Better Business Bureau, seeking compensatory and punitive damages and alleging that the Bureau failed to investigate the statements made in the reliability reports, which it contended were false and defamatory.[2]

---

**2.** In its initial complaint, Appellant named the Eastern Pennsylvania affiliate as the sole defendant. Because the latter had ceased operations more than one year previously, see 42 Pa.C.S. § 5523(1) (setting forth a one-year statute of limitations for defamation actions), Appellant

At the seven-day jury trial, Appellant claimed that the Better Business Bureau published the statements negligently because, contrary to the Bureau's operations manual requiring it to thoroughly substantiate customer complaints before relying on them, the Bureau made no effort to determine whether such complaints were true prior to issuing the reliability reports. Further, Appellant alleged that the Bureau failed to determine whether the complaints were representative of the company as a whole, considering the size of its business. Satell testified that Appellant saw a reduction in profits as a result of the report.

The Bureau adduced documentary evidence of over one hundred complaints it received from customers stating that they had been billed by Appellant for unordered merchandise.[3] The Bureau additionally presented the testimony of multiple witnesses who had had unsatisfactory dealings with Appellant. One witness testified that she was unable to cancel her subscription by following Appellant's stated procedure of writing "cancel" on the initial invoice and returning it, and that other individuals in her small business had experienced the same difficulty. *See* N.T. October 9, 2003, at 135–39. Other witnesses stated that Appellant had billed them for newsletters they did not order; the newsletters arrived in an envelope resembling junk mail, as did the invoices; the invoices did not include Appellant's phone number or cancellation policy; after discarding such items believing them to be junk mail, they began receiving calls from a collection agency and were thereafter unable to cancel their subscriptions; and their subscriptions were only cancelled after they either complained to the

was granted leave to file an amended complaint in which it added the Washington, D.C. affiliate as an additional defendant. The amended complaint also alleged, as separate causes of action, commercial disparagement and tortious interference with existing and prospective business relations. Those counts were ultimately dismissed, and are not at issue in this appeal.

3. Although the court only admitted into evidence the substance of complaints filed within the three-year period covered by the report, the Bureau's regional vice president testified that the volume of complaints concerning Appellant has increased to nearly 400 per three-year reporting period. *See* N.T. October 10, 2003, at 19, 25.

Better Business Bureau or had an attorney contact Appellant. *See id.* at 99–106, 118–22, 131.

It was undisputed at trial that Appellant expends half a million dollars per year on marketing, and that at least $2 million in revenue is generated annually through collection agencies. In this regard, one of the Bureau's witnesses testified that she paid the bill after being contacted by a collection agency, not because she believed she had ordered a subscription from Appellant, but solely to ensure that her company's credit rating did not suffer. *See* N.T. October 9, 2003, at 100–02.

Over Appellant's objection, the trial court charged the jury that the Better Business Bureau enjoyed a conditional privilege in connection with the issuance of reports of consumer complaints. The court further instructed that, to overcome this privilege, Appellant was required to demonstrate that the Bureau published a false and defamatory communication with actual malice, that is, with knowledge that it was false or with reckless disregard as to its truth or falsity. *See Masson v. New Yorker Magazine,* 501 U.S. 496, 510–11, 111 S.Ct. 2419, 2429–30, 115 L.Ed.2d 447 (1991); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). Over the Bureau's objection, however (which was renewed after the charge was delivered), the court refused to instruct the jury that Appellant was a public figure. The jury ultimately rendered a verdict in favor of the Better Business Bureau, and completed a verdict form reflecting a finding that the Bureau did not defame Appellant.[4]

Appellant moved for post-trial relief, requesting judgment notwithstanding the verdict or, in the alternative, a new trial, and asserting, *inter alia,* that the trial court had erred by instructing the jury that the Bureau was entitled to a conditional privilege requiring Appellant to prove actual malice.

4. Because there were no special interrogatories, it is not clear from the verdict form whether the jury's finding of no defamation was based upon a determination that actual malice was not demonstrated, or upon some other ground. Thus, it is possible that the jury found all elements of the cause of action to have been proved, except for malice.

Rather, Appellant argued, the Bureau did not retain any conditional privilege and, moreover, because the court had determined that Appellant was a private-figure plaintiff, it only needed to prove negligence on the part of the Bureau in publishing false and defamatory statements. The trial court denied post-trial relief and eventually issued an opinion under Rule of Appellate Procedure 1925(a) in support of such denial. *See* Pa.R.A.P. 1925(a).

In its opinion, the trial court observed that the determination of whether a communication is conditionally privileged is a question for the court, and that a publication is conditionally privileged if the publisher reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know the information conveyed. Because the Bureau is a consumer reporting agency, the court stated that the disputed publication clearly met this standard. The court additionally explained that, once it found that a conditional privilege applied, whether such privilege was abused was a factual question for the jury. *See generally Bargerstock v. Washington Greene Cmty. Action Corp.*, 397 Pa.Super. 403, 411, 580 A.2d 361, 364 (1990). As for the plaintiff's burden of proof on that issue, the court referenced Section 600 of the Second Restatement of Torts for the position that the plaintiff must show that the defendant published the allegedly false and defamatory statement with actual malice (as opposed to mere negligence). On this topic, the court recognized that both the comment to the Restatement and the subcommittee note to Section 13.09 of the Pennsylvania Suggested Standard Civil Jury Instructions explain that, if mere negligence were sufficient to abuse a conditional privilege, the policy on which the conditional privilege was based would no longer be served. *See* RESTATEMENT (SECOND) OF TORTS § 600 (1977), official cmt. b; PENNSYLVANIA SUGGESTED STANDARD CIVIL JURY INSTRUCTIONS § 13.09, subcommittee note 2 (2003).[5] Therefore, the trial

---

5. The trial court acknowledged that, in some reported cases, a defendant's negligence in publishing a defamatory statement has been deemed sufficient to constitute an abuse of a conditional privilege. *See Bargerstock*, 397 Pa.Super. at 411, 580 A.2d at 364; *Green v. Mizner*, 692 A.2d 169, 175 (Pa.Super.1997) ("An abuse of a conditional privilege

court stated that it had correctly omitted any reference to negligence in its jury instructions regarding abuse of a conditional privilege, and had properly instructed the jury that the privilege should only be deemed abused if malice was proven. *See American Future Sys. v. Better Business Bureau of Eastern Pa.*, No. 00520, Nov. Term 2001, *slip op.* at 4–6, 2004 WL 5235105 (C.P. Phila. May 5, 2004).

A unanimous panel of the Superior Court affirmed in a published opinion. While the panel acknowledged that negligence may be sufficient to defeat a claim of conditional privilege where the plaintiff is a private figure and the speech does not involve a matter of public concern, it indicated that statements on topics involving a recognized public interest are at the heart of the First Amendment's protections. *See* U.S. CONST. amend. I ("Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ."). Thus, the panel ultimately agreed with the trial court that malice was required to abuse the conditional privilege in the present case, because the Better Business Bureau's statements pertained to consumer complaints about Appellant's sales practices, which the panel deemed to touch upon a matter of public concern. *Cf. Unelko Corp. v. Rooney*, 912 F.2d 1049, 1056 (9th Cir.1990) (finding that a statement concerning the effectiveness of a consumer product addressed a matter of public concern). Accordingly, the Superior Court panel found no error in the trial court's jury charge. *See American Future Sys. v. Better Business Bureau of Eastern Pa.*, 872 A.2d 1202, 1210–11 (Pa.Super.2005).

We initially allowed appeal to consider whether a private-figure plaintiff seeking to recover damages resulting from

occurs . . . when the publication is actuated by malice or negligence[.]"). The court interpreted other decisions, however, as establishing a malice prerequisite. *See Berg v. Consolidated Freightways, Inc.*, 280 Pa.Super. 495, 421 A.2d 831 (1980) (determining that a trial court's charge to the jury requiring malice was consistent with a conditional privilege); *Doman v. Rosner*, 246 Pa.Super. 616, 371 A.2d 1002 (1977) (finding that an alleged libelous statement was not capable of a defamatory meaning and, even if it was, the statement concerned a public figure and was subject to a qualified privilege requiring plaintiff to show defendant acted with malice).

speech on matters of public concern must prove actual malice, either due to the existence of a conditional privilege on the part of the speaker, or as a general proposition.[6] After hearing argument, we entered an order permitting the parties to file supplemental briefs on the issue of whether Appellant is a limited-purpose public figure. As there are no relevant facts in dispute concerning these matters, their resolution involves questions of law over which our review is plenary. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 938 (3d Cir.1990) (noting that the classification of a claimant as a public or private figure is a "question of law to be determined initially by the trial court and then carefully scrutinized by an appellate court"); *accord Schwartz v. American Coll. of Emergency Physicians,* 215 F.3d 1140, 1145 (10th Cir.2000); *Bongiovi v. Sullivan,* 122 Nev. 556, 138 P.3d 433, 445 (2006). *Brown v. Philadelphia Tribune Co.,* 447 Pa.Super. 52, 58, 668 A.2d 159, 162 (1995).

 Because one individual's speech has the ability to harm another person's reputation, there is an inevitable tension in the law between the goals of protecting freedom of expression and safeguarding reputation from unjust harm. *See generally Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *Norton v. Glenn,* 580 Pa. 212, 228, 860 A.2d 48, 58 (2004) (referring to the "seesawing balance between the constitutional rights of freedom of expression and of safeguarding one's reputation"). On one side of the equation, the Court in *New York Times* determined that the First Amendment limits the reach of state defamation laws. *See New York Times,* 376 U.S. at 269, 84 S.Ct. at 720;

**6.** As used in this discussion, the term "actual malice" (sometimes shortened to "malice") is a term of art that refers to a speaker's knowledge that his statement is false, or his reckless disregard as to its truth or falsity. Thus, it implies at a minimum that the speaker " 'entertained serious doubts about the truth of his publication,' . . . or acted with a 'high degree of awareness of . . . probable falsity.' " *Masson v. New Yorker Magazine,* 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991) (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)). This term "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Id.*

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 755, 105 S.Ct. 2939, 2943, 86 L.Ed.2d 593 (1985). On the other side, this Court has indicated that reputational interests occupy an elevated position within our state Constitution's system of safeguards,[7] and hence, in the context of defamation law the state Constitution's free speech guarantees are no more extensive than those of the First Amendment. *See Sprague*, 518 Pa. at 439, 543 A.2d at 1085; *Norton*, 580 Pa. at 229, 860 A.2d at 58 ("[S]ince we have found that the First Amendment does not encompass [the neutral reportage doctrine], we conclude that the Pennsylvania Constitution does not as well.").

Presently, the trial court identified a privilege held by "consumer reporting agencies to issue fair and accurate reports of consumer complaints" as constituting such a common law doctrine triggering the malice requirement. Appellant suggests, however, that this does not reflect a limitation extant under prevailing First Amendment jurisprudence. Rather, it argues, it is properly seen as a remnant of the pre-*New York Times* paradigm which gave the plaintiff certain evidentiary and procedural advantages, including a presumption that any defamatory statement was false and was made maliciously. We find merit in Appellant's contention.

 Under Pennsylvania's common law regime, the defendant was strictly liable for the publication of a defamatory statement unless he could prove that the statement was true, *see Sprague*, 518 Pa. at 441 n. 8, 543 A.2d at 1086 n. 8,[8] or that

---

7. While the Pennsylvania Constitution, as well as the First Amendment, protects freedom of speech and of the press, *see* PA. CONST. art. I, § 7, the state charter places reputational interests on the highest plane, that is, on the same level as those pertaining to life, liberty, and property. *See* PA. CONST. art. I, §§ 1, 11; *Sprague v. Walter*, 518 Pa. 425, 438-39, 543 A.2d 1078, 1084 (1988). *See generally Norton v. Glenn*, 580 Pa. 212, 225-26, 860 A.2d 48, 56 (2004) (" 'The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being ....' " (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22, 110 S.Ct. 2695, 2708, 111 L.Ed.2d 1 (1990))).

8. The common law's presumption of falsity of a defamatory statement was based on several grounds, including that an individual accused of

it was subject to a privilege. For such a privilege to arise, the communication must have been "made upon a proper occasion, from a proper motive, in a proper manner and based upon reasonable and probable cause." *Dempsky v. Double,* 386 Pa. 542, 546–47, 126 A.2d 915, 917 (1956). Only after the defendant established privilege did the plaintiff bear the burden of demonstrating that the privilege was abused. In some instances, the plaintiff could show abuse of the privilege by proving the defendant's "[w]ant of reasonable care and diligence to ascertain the truth," *i.e.,* negligence. *Morgan v. Bulletin Co.,* 369 Pa. 349, 354, 85 A.2d 869, 872 (1952) (quoting *J. Hartman & Co. v. Hyman & Lieberman,* 287 Pa. 78, 84, 134 A. 486, 488 (1926)). In other instances, the Court formulated the plaintiff's burden by reference to "legal malice," signifying a wrongful, intentional act, committed without justification or excuse. *See, e.g., Corabi v. Curtis Publ'g Co.,* 441 Pa. 432, 451, 273 A.2d 899, 909 (1971); *cf. Briggs v. Garrett,* 111 Pa. 404, 414, 2 A. 513, 521 (1886), *quoted in Morgan v. Bulletin Co.,* 369 Pa. 349, 353–54, 85 A.2d 869, 872 (1952) (utilizing the term "actual malice" to denote legal malice). This scheme developed during an era in which the First Amendment was inapplicable to the law of libel. *See Roth v. United States,* 354 U.S. 476, 486, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498 (1957); *Beauharnais v. Illinois,* 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919 (1952). The policy underlying the doctrine was that

> the public interest and the advantage of freedom of publication, in each particular class of cases thus protected, outweigh the occasional private and personal damage thereby caused. It is deemed in certain classes of cases more

wrongdoing was presumed innocent, the defendant was better positioned to prove affirmative facts contained in the statement—particularly as it is difficult to prove a negative—and the plaintiff was generally barred from offering good-character evidence in his case in chief. *See Hepps v. Philadelphia Newspapers,* 506 Pa. 304, 311–12 & n. 1, 485 A.2d 374, 378–79 & n. 1 (1984), *rev'd on other grounds,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). As a federal constitutional matter, the burden has now been shifted to the plaintiff (even a private one) to show falsity, at least where the speech is on a matter of public concern. *See Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986).

advantageous for the community at large that particular individuals should occasionally be damaged with impunity, than that men under the exceptional circumstances should not be at liberty to speak and publish what they reasonably believe to be true, although it may be defamatory of the character of individuals.

*Williams v. Kroger Grocery & Baking Co.*, 337 Pa. 17, 19, 10 A.2d 8, 9 (1940).[9]

While the pre-*New York Times* decisions of this Court are not entirely consistent as to whether "legal malice" or mere negligence was required to demonstrate abuse of a privilege, *cf. supra* note 5 (reflecting a similar inconsistency in the decisions of the Superior Court), it is worth noting that the doctrine of privilege functioned more as an affirmative defense within the strict liability framework than a mechanism to augment the level of fault that a plaintiff was required to prove. In any event, state law pertaining to common law privileges was affected in the latter part of the Twentieth Century by the United States Supreme Court's decisions constitutionalizing aspects of defamation law.

▮ In particular, the Supreme Court began applying the First Amendment to this area of the law in 1964 in *New York Times;* a decade later, the *Gertz* Court determined that, although "the States retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual," *Gertz,* 418 U.S. at 345–46, 94 S.Ct. at 3010, they may not impose liability without fault. *See id.* at 347, 94 S.Ct. at 3010. In the wake of *New York Times* and *Gertz* this Court concluded that the former Pennsylvania state law conditional privileges (at least those that could be overcome by a showing of negligence) had "lost their significance" because, "[i]f a private-figure plaintiff is to maintain any cause of action at all, he must minimally estab-

9. The common-law privilege, sometimes termed a "defeasible immunity," arose when the statement was made by a person having "a social or moral duty" to convey the information, and the recipient also retained an interest in or duty to receive the information. *Kroger Grocery*, 337 Pa. at 19–20, 10 A.2d at 9; *see also Nagle v. Nagle*, 316 Pa. 507, 511, 175 A. 487, 489 (1934).

lish the negligence on the part of the publisher. In doing so, 'he has by that very action proved any possible conditional privilege was abused.'" *Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 323, 485 A.2d 374, 384–85 (1984) (quoting RESTATEMENT (SECOND) OF TORTS, Topic 3, Title A, Special Note, at 259 (1977)), *rev'd on other grounds*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

The closest analog to a privilege which could have applied at trial in the present matter was a "defeasible immunity" as described in *Kroger's Grocery. See supra* note 9. As that decision explained, inherent in the definition of the privilege was the concept that in certain instances speakers must "be at liberty to speak and publish what they reasonably believe to be true, although it may be defamatory of the character of individuals." *Kroger Grocery*, 337 Pa. at 19, 10 A.2d at 9. This formulation reflects a negligence standard for overcoming the privilege, as it requires not only a belief in the truth of the challenged statement, but a reasonable one. It is also consistent with the general standard articulated in the first Restatement of Torts, Section 601 of which clarified that a conditional privilege was abused whenever the individual had "no reasonable grounds" for believing that the defamatory matter was true, RESTATEMENT (FIRST) OF TORTS § 601 (1938), a construct officially recognized as encompassing a negligence test. *See id.*, Official Comment a ("The negligence of the publisher in making unqualified statements of fact without knowledge of circumstances which would lead a reasonable man to believe them to be true, is an abuse of the occasion.") Finally, any privilege that the Bureau retained in this case was clearly analogous to a credit reporting agency's "conditional privilege to publish defamatory matter" recognized in *Baird v. Dun & Bradstreet*, 446 Pa. 266, 274, 285 A.2d 166, 171 (1971), which could be overcome by a showing of negligence rather than malice. *See id.* at 275, 285 A.2d at 171.

The import of the above discussion concerning the common-law framework extant in Pennsylvania prior to *New York Times*, the Supreme Court's decisions constitutionalizing defamation law, and the negligence standard inherent in the

common-law definition of a number of conditionally privileged occasions, is that, post-*Gertz*, every defamation defendant is privileged at least to the extent contemplated in *Kroger's Grocery*, *Baird*, and Section 601 of the First Restatement. Logically, then—and as suggested above in relation to *Hepps*—this renders the former concept of a conditionally privileged occasion embodying the negligence standard superfluous in the present era. The only way to avoid this conclusion would be to permit such pre-existing privileges to be judicially reformulated so that the plaintiff must prove actual malice, rather than negligence, to prevail. Such reformulations would be in substantial tension with the developments alluded to above in *Sprague* and, especially, *Norton*, where the Pennsylvania Constitution was construed to highly prioritize reputational interests so as to preclude any departure from the level of fault expressly required by the First Amendment for media reportage of government proceedings. In short, as a matter of common-law decisionmaking, Pennsylvania courts will not strengthen—for post-*Gertz* purposes—conditional privileges previously defined by reference to negligence principles so that, now, they may only be defeated by proving actual malice. This is essentially what the trial court did in the present case.[10]

10. Our holding in this regard has no effect on previously recognized privileges that conferred absolute immunity in certain defined circumstances. *See, e.g., Bochetto v. Gibson,* 580 Pa. 245, 251, 860 A.2d 67, 71 (2004) ("Pursuant to the judicial privilege, a person is entitled to absolute immunity for communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought." (internal quotation marks omitted)); *Corabi,* 441 Pa. at 452 & n. 9, 273 A.2d at 909 & n. 9. Nor should it be understood to foreclose legislative creation of privileges which may, within constitutional limitations, require a showing of fault greater than negligence. Indeed, the General Assembly is better suited than the judiciary to balance the social policy considerations involved in determining when potentially defamatory speech warrants special protection beyond that guaranteed by the Constitution, *see Corabi,* 441 Pa. at 451, 273 A.2d at 909 ("The basis of the defense of privilege is public policy[.]"), particularly as any such rule would affect the litigants' substantive rights. *See generally Conner v. Quality Coach,* 561 Pa. 397, 417, 750 A.2d 823, 834 (2000) ("[T]o the extent that litigants' substantive rights are to be substantially altered, modified, abridged or enlarged on the basis of public policy centered upon the protection of the

██ Notwithstanding the above, and apart from any common law privilege, the Bureau argues that actual malice is nonetheless the required standard under the First Amendment because the speech at issue pertained to a matter of public concern. *See* Brief for Appellee at 19 (citing, *inter alia, Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)).[11] The Bureau finds support for this position in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (plurality opinion), which was issued after *New York Times* but before *Gertz.* The *Rosenbloom* plurality stated that regardless of whether a plaintiff was "famous or anonymous," the appropriate standard for liability was actual malice whenever the statement related to a matter of public concern. *See id.* at 43–44, 91 S.Ct. at 1819–20; *see also Matus v. Triangle Publ'ns, Inc.,* 445 Pa. 384, 395, 286 A.2d 357, 363 (1971) (plurality opinion) (concluding that *Rosenbloom* binds this Court and requires defamation plaintiffs to prove actual malice where the statement relates to a matter of public concern). The difficulty is that three years later, the *Gertz* Court essentially disavowed the plurality's determination in this regard, and concluded that the First Amendment does not force states to require a showing of actual malice where a private person's reputation is harmed, even where the speech pertains to a matter of public or general interest. *See Gertz,* 418 U.S. at 346, 94 S.Ct. at 3010. Accordingly, this Court has, since *Matus,* recognized that any focus on whether the speech is of public or private concern has been replaced by an inquiry into

public fisc through elimination of pass-through costs, such a rule, if appropriate, will have to originate in the legislative branch."); *Naylor v. Township of Hellam,* 565 Pa. 397, 408, 773 A.2d 770, 777 (2001) (recognizing the Legislature's superior ability to examine social policy issues and determine legal standards so as to balance competing concerns); *Glenn Johnston Inc. v. Commonwealth, Dep't of Revenue,* 556 Pa. 22, 30, 726 A.2d 384, 388 (1999) (emphasizing that policy determinations are generally within the sphere of the Legislature); *Pegram v. Herdrich,* 530 U.S. 211, 221, 120 S.Ct. 2143, 2150, 147 L.Ed.2d 164 (2000) (same).

11. Appellant concedes for purposes of this appeal that the Bureau's reliability reports involved a matter of public concern. *See, e.g.,* Brief for Appellant at 3.

whether the plaintiff is a public or private figure. *See Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 319 n. 6, 485 A.2d 374, 382 n. 6 (1984), *rev'd on other grounds*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). *See generally Rutt v. Bethlehems' Globe Publ'g Co.*, 335 Pa.Super. 163, 186, 484 A.2d 72, 83 (1984) (discussing the effect of *Gertz* on *Matus*); John J. Watkins & Charles W. Schwartz, *Gertz and the Common Law of Defamation: Of Fault, Nonmedia Defendants, and Conditional Privileges*, 15 TEX. TECH L.REV. 823, 829 (1984) ("This [*Gertz*] reformation not only dramatically altered the common-law scheme . . . but also returned to importance the distinction between public and private plaintiffs that had been rendered virtually meaningless by *Rosenbloom*.").[12]

Under *Gertz*, therefore, the appropriate standard of fault depends on whether the plaintiff is a public or private figure. *See Gertz*, 418 U.S. at 343, 94 S.Ct. at 3008–09 (articulating that "the state interest in compensating injury to

12. Eleven years after *Gertz*, in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759, 105 S.Ct. 2939, 2945, 86 L.Ed.2d 593 (1985), a plurality of Justices endorsed (albeit in dicta) the position seemingly disavowed in *Gertz*. *See* Nat Stern, *Private Concerns of Private Plaintiffs: Revisiting a Problematic Defamation Category*, 65 Mo. L.REV. 597, 602 (2000) ("While *Gertz* had apparently rejected basing plaintiffs' evidentiary hurdles on the subject matter of libelous statements, *Dun & Bradstreet* reintroduced this approach to defamation doctrine."). The following year, a majority of Justices reaffirmed the position that speech of public-concern is subject to greater First Amendment protection than that of exclusively private concern. *See Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 774–75, 106 S.Ct. 1558, 1562–63, 89 L.Ed.2d 783 (1986). Four years after that, however, in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Court re-stated the framework for analyzing the First Amendment limitations on the states' ability to protect reputation under defamation law. *Milkovich* adhered to the *Gertz* formulation by developing that, where a statement on a matter of public concern "implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth"—i.e. actual malice, *id.* at 20, 110 S.Ct. at 2707 (citing *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)), whereas states may impose liability on a lesser basis as to statements about a private figure on a matter of public concern, so long as they require some showing of fault. *See id.* at 20–21, 110 S.Ct. at 2707.

the reputation of private individuals requires a different rule should obtain with respect to them" as compared to public figures). If the plaintiff is a public official or public figure, *see Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967) (extending the actual malice requirement to public figures who are not governmental officials), and the statement relates to a matter of public concern, then to satisfy First Amendment strictures the plaintiff must establish that the defendant made a false and defamatory statement with actual malice. *See Gertz*, 418 U.S. at 343, 94 S.Ct. at 3008–09; *Milkovich*, 497 U.S. at 14–15, 20, 110 S.Ct. at 2703, 2706–07. In contrast, states are free to allow a private-figure plaintiff to recover by establishing that the defendant acted negligently rather than maliciously. The Superior Court has adopted this test, *see Rutt*, 335 Pa.Super. at 186, 484 A.2d at 83 ("[A] private figure defamation plaintiff, seeking compensation for harm inflicted as a result of the publication of defamatory matter, must prove that the defamatory matter was published with 'want of reasonable care and diligence to ascertain the truth' or, in the vernacular, with negligence."), and at least one federal court has predicted that this Court will do so as well. *See Wilson v. Slatalla*, 970 F.Supp. 405, 414 n. 2 (E.D.Pa.1997). Indeed, we do find this to be the appropriate standard relative to a private-figure plaintiff for the reasons discussed above pertaining to the Pennsylvania Constitution's protections in the area of reputational interests, and in view of our understanding of the United States Supreme Court's present interpretation of the First Amendment. *See supra* note 12.

This analysis contrasts with the framework employed by the trial court and Superior Court, under which those tribunals indicated that a private-figure plaintiff could be required to shoulder the burden of proving that the defendant acted with actual malice when issuing consumer reports. *See American Future Systems, Inc.*, 872 A.2d at 1210. In light of this discrepancy, and because the jury did not specify its basis for its finding of no defamation, *see supra* note 4, we allowed supplemental briefing because of our concern that Appellant

may not be a private figure, but may instead be a limited-purpose public figure relative to the statements at issue. If Appellant is a public figure for this purpose, then the trial court's error was harmless, as the First Amendment would require a showing of actual malice to support liability. *See Masson,* 501 U.S. at 510, 111 S.Ct. at 2429; *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008; *Ertel v. Patriot–News Co.,* 544 Pa. 93, 99, 674 A.2d 1038, 1041 (1996). *See generally Aldridge v. Edmunds,* 561 Pa. 323, 334, 750 A.2d 292, 298 (2000) (reciting that a new trial is not warranted in a civil case in spite of a trial court's error where the error did not cause prejudice).

Appellant preliminarily urges us not to resolve this case based on the public-figure/private-figure distinction because, in its view, the Better Business Bureau waived any objection to Appellant's designation as a private figure by failing to raise it before the Superior Court. *See* Supplemental Brief for Appellant at 6–7. As noted, however, the Bureau preserved its objection to Appellant's classification at trial and, as the complete verdict winner, lacked standing to appeal the common pleas court's adverse ruling. *See* Pa.R.A.P. 501; *United Parcel Svc. v. Pennsylvania Pub. Util. Comm'n,* 574 Pa. 304, 315, 830 A.2d 941, 948 (2003). Having prevailed before the Superior Court, the Bureau similarly lacked standing to cross-appeal to this Court. Thus, the concept of waiver is not applicable to the issue of whether the trial court erred in denominating Appellant a private-figure plaintiff. Were we to ignore the question, moreover, we would fail to "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (internal quotation marks omitted); *see Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20–21, 110 S.Ct. 2695, 2706–07, 111 L.Ed.2d 1 (1990) (suggesting that the enhanced appellate review required by *Bose Corp.* applies to determinations as to public-figure versus private-figure status pursuant to the *Gertz* framework). Thus, we are not impeded in addressing the issue of Appellant's classification before deciding whether

to remand for a new trial. *See generally McAdoo Borough v. Commonwealth, Pa. Labor Relations Bd.*, 506 Pa. 422, 428 n. 5, 485 A.2d 761, 764 n. 5 (1984) ("It is well settled that this Court may affirm for any reason and is not limited to grounds raised by the parties."); *Commonwealth v. Booth*, 564 Pa. 228, 245, 766 A.2d 843, 852 (2001) ("Having determined that the Superior Court's analysis does not support its conclusion, we may nevertheless affirm that conclusion if it is correct on any other ground."); *Bell v. Yellow Cab Co.*, 399 Pa. 332, 337, 160 A.2d 437, 440 (1960).

Recognizing that public figures assume special prominence in the affairs of society, *Gertz* observed that two characteristics are particularly relevant to such designation, namely, the ability to rebut the defamatory statements due to greater access to the channels of communication than private individuals, *see Gertz*, 418 U.S. at 344, 94 S.Ct. at 3009 ("Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."), and voluntary exposure to controversy, *see id.* at 345, 94 S.Ct. at 3010 (indicating that "public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them."). Further, *Gertz* determined that the classification as a public figure arises in two circumstances: first, referring to an "all purpose" public figure, the Court explained that, "in some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id.*, 418 U.S. at 351, 94 S.Ct. at 3013. Alternatively, a "limited purpose public figure," which according to the Court is more common, is an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* To determine such status, the Court instructed that it is necessary to consider the "nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013; *see also Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 246 n. 3, 106 S.Ct. 2505, 2509 n. 3, 91 L.Ed.2d 202 (1986).

Traditionally, a plaintiff could only be considered a limited-purpose public figure relative to a pre-existing controversy in which he elected to participate. *See Rutt,* 335 Pa.Super. at 181–82, 484 A.2d at 81; *cf. Hutchinson v. Proxmire,* 443 U.S. 111, 134–35, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) (noting that a defamation plaintiff does not become a public figure simply because the news media give him an opportunity to respond). More recently, however, some courts have held that a controversy may be created by a plaintiff's own activities, particularly with respect to widespread public solicitation and advertisements. In *National Foundation for Cancer Research (NFCR) v. Council of Better Business Bureaus,* 705 F.2d 98 (4th Cir.1983), for example, the court addressed whether NFCR could recover from the Council of Better Business Bureaus based upon an allegedly defamatory report concerning the Foundation's use of donated funds. The report stated that NFCR did not meet the Council's standards— which required a charitable institution to spend a reasonable percentage of its total income on program services—and further described aspects of NFCR's fund-raising campaign materials as inaccurate and misleading. The Fourth Circuit ultimately determined that NFCR was a limited-purpose public figure in relation to the public controversy surrounding its solicitation and use of funds. The court rejected NFCR's claim that the only controversy was a private dispute regarding the Council's evaluation of the charity, explaining that "[e]ven though the 'public controversy' which formed the basis of this lawsuit arose almost entirely from the Foundation's solicitation and use of funds for its cancer research, the mere fact that the NFCR generated the controversy does not preclude a finding that there was, in fact, a controversy." *Id.* at 101. The court continued:

> The evidence is uncontroverted that the Foundation had thrust itself into the public eye, not only through its massive solicitation efforts (almost 68 million pieces of direct mail solicitation in the past three years), but also through the

claims and comments it made in many of these solicitations where it extolled its judicious use of donated funds in finding a cure for cancer, where it declared its objective to make "NFCR a household word," and where it asserted the need "to present [NFCR's] case to the jury of the American people." The Foundation vigorously sought the public's attention, and succeeded to a substantial degree, as is reflected by the approximately $25,000,000 it raised in the past three years and the numerous inquiries the [Council of Better Business Bureaus] had received from the public and the media regarding NFCR. It was these inquiries which in fact led the Council to undertake its evaluation.

*Id.*

A similar result was reached by the Third Circuit in *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3d Cir.1980). In that matter, the court determined that an Ohio corporation became a limited-purpose public figure by virtue of the extensiveness of its outreach to the public in attempting to sell its beef products upon entering the Pittsburgh area. While *Steaks Unlimited* recognized that one *Gertz* factor supporting limited-purpose public figure status concerns greater-than-normal access to the media, it additionally noted that *Gertz* itself had clarified that a "more important" factor is

"a compelling normative consideration underlying the distinction between public and private defamation plaintiffs." Simply stated, public figures are "less deserving of (judicial) protection ... because they have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" In other words, public figures effectively have assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention.

*Steaks Unlimited,* 623 F.2d at 273 (ellipsis in original) (quoting *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009, and *Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 164, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979)); *see also Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 589–90 (1st Cir.1980) (recognizing that, although many corporations have no particu-

lar advantage over private persons in gaining access to the channels of communication, the factor of "thrusting" one's self into the public eye via promotional efforts is "more significant" under *Gertz*). The *Steaks Unlimited* court observed that the plaintiff had launched an intensive advertising campaign upon entering the Pittsburgh area where it sought to sell its goods, and that the local bureau of consumer affairs, as well as the defendant local television station, had received numerous contacts from area customers complaining that the company was misrepresenting the type and quality of the beef being sold. Under these circumstances, the Third Circuit determined that the plaintiff was a public figure for the limited purpose of commentary concerning its products and sales practices.

Presently, Appellant insists that, in its telephone solicitations, it neither promoted its business performance record nor denied that it had ever become the subject of consumer complaints. Since these were the topics of the contested statements issued by the Better Business Bureau, Appellant argues that any comparison between the present matter and *NFCR* is misplaced, particularly as *NFCR* premised its holding on the fact that the plaintiff had employed its advertising campaign to highlight its careful use of donated funds, which was the very topic of the contested report in that matter. In this regard, Appellant also points out that the Fourth Circuit has since clarified that the designation of NFCR as a limited-purpose public figure was based, not only on the fact of extensive promotional advertising, but upon a "direct relationship between the promotional message and the subsequent defamation (indicating plaintiff's pre-existing involvement in the particular matter of public concern and controversy)." *Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 687 (4th Cir.1989). Thus, because the Fourth Circuit now deems both elements necessary, the *Blue Ridge Bank* court declined to find that a bank was a limited-purpose public figure based solely on its extensive promotional campaign, as the bank had not raised the subject of the defamatory statements—its corporate financial health—in its advertisements. *See id.* at 687–88.

■ We find the analysis of *NFCR*, as modified by *Blue Ridge Bank*, persuasive and adopt its framework. While we recognize, as Appellant argues, that *Blue Ridge Bank* limited *NFCR's* holding to cases in which there is, *inter alia*, a subject-matter nexus between the content of the plaintiff's public solicitations and advertisements on the one hand, and the allegedly defamatory report at issue on the other, we believe that such is the case here. For present purposes, we may assume that Appellant is correct in asserting that its telephone solicitors neither promoted its business performance record nor denied that consumers occasionally complain about its order-cancellation policy. Nevertheless, it is undisputed that the telemarketers touted the cancellation policy and the purported lack of any risk in ordering a subscription; the Bureau's reports had at their core these same issues, as they reflected consumer complaints regarding such things as Appellant's alleged failure to honor cancellation requests and its decision to omit its phone number or cancellation policy from its invoices, thus depriving the employer's corporate offices (which may not know whether the order is valid, *see, e.g.*, N.T. October 9, 2003, at 139) of a readily available means to request cancellation or inquire as to the validity of the invoice. Accordingly, here, as in *NFCR*, there is a subject-matter overlap between the promotional message and the allegedly defamatory speech. This, in turn, militates in favor of a determination that Appellant became a public figure for the limited purpose of commenting upon its sales practices under the *NFCR/Blue Ridge Bank* framework.

As revealed at trial, moreover, Appellant expended significant time and resources in soliciting business and making its products known. Its campaign employed a force of 500 telemarketers at fifteen locations throughout the country to solicit 15,000 customers each week. Appellant's telemarketing director testified that these employees made approximately 25 million phone calls per year and actually spoke with 2.2 million business executives annually. *See* N.T. October 7, 2003, at 138–39. Pursuant to Appellant's invoicing policy, once the free subscription period passed, Appellant billed the customer

and, if unpaid or not cancelled, the customer's employer, thus generating gross revenues of $29 million in 2002 alone. As a result of these practices, hundreds of complaints were sent to the Better Business Bureau, and the statements of the Better Business Bureau were limited to reporting its receipt of such complaints and concluding that Appellant's business record was "unsatisfactory" on the basis of this pattern of complaints. Thus, we find that Appellant's national sales campaign and its "no-risk" offer resulted in a controversy concerning the authenticity of such practices, which invited comment regarding those aspects of its business.

Finally, while Appellant maintains, with some validity, that companies should not be deemed limited-purpose public figures merely because they open their doors for business or advertise their products,[13] inquiries into limited-purpose public figure status are particularized and fact-sensitive, *accord Bruno & Stillman,* 633 F.2d at 589; *Snead v. Redland Aggregates*

13. *See, e.g., Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 589 & n. 6 (1st Cir.1980) (boat manufacturer was not a public figure merely by being in business or advertising to some extent); *Golden Bear Distrib. Sys. of Texas v. Chase Revel, Inc.,* 708 F.2d 944, 952 (5th Cir.1983) (stating that the "mere fact of advertising" does not render a business a public figure); *Vegod Corp. v. American Broad. Cos.,* 25 Cal.3d 763, 160 Cal.Rptr. 97, 603 P.2d 14, 18 (1979) ("[A] person in the business world advertising his wares does not necessarily become part of an existing public controversy."); *Bank of Oregon v. Independent News, Inc.,* 298 Or. 434, 693 P.2d 35, 42 (1985); *see also Antwerp Diamond Exch. v. Better Business Bureau of Maricopa County,* 130 Ariz. 523, 637 P.2d 733, 737 (1981) (corporation's mail and telephone solicitations were insufficiently widespread to render corporation a public figure); *Worldnet Software Co. v. Gannett Satellite Info. Network,* 122 Ohio App.3d 499, 702 N.E.2d 149, 155 (1997) (software company was not a public figure where its Internet advertising was not "extensive"). *But see Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.,* 738 F.Supp. 1499, 1507 (D.S.C.1989) ("Just as the plaintiffs had the means to conduct their advertising campaigns, they could have used the same means to refute any criticism they received from the defendants. Accordingly, . . . plaintiffs were public figures with regard to the controversy surrounding the broadcast [criticizing plaintiffs' merchandising practices]."); *Parker v. Evening Post Publ'g Co.,* 317 S.C. 236, 452 S.E.2d 640, 644 n. 3 (Ct.App.1994) ("[B]y extensively advertising his return to the car business, Parker . . . invited the public's attention and assumed the accompanying risk of that attention. Thus, as to statements regarding Parker's dealership, it seems clear that Parker is a public figure.").

*Ltd.,* 998 F.2d 1325, 1329 (5th Cir.1993), and cannot be resolved solely by reference to such a broad proposition. *See generally Snead,* 998 F.2d at 1329 ("[T]rying to decide whether a particular plaintiff is a public or private figure is much like trying to nail a jellyfish to the wall. The inquiry becomes even more difficult when the libel plaintiff is a corporation[.]" (internal quotation marks omitted)). Here, Appellant's promotional efforts were vast, and, as noted, a subject-matter nexus existed between the Bureau's reports and the content of the sales pitch used by Appellant's telemarketers. Additionally, Appellant is a publishing company with an on-going direct-mail solicitation component and millions of customers on its mailing list. As such, it has greater access to the channels of effective communication than ordinary private citizens for purposes of counteracting statements it perceives as false. *See Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009. Under all of these circumstances, we are satisfied that, consistent with *NFCR/Blue Ridge Bank* and *Steaks Unlimited,* Appellant was a public figure for the limited purpose of commentary concerning its business practices. Therefore, to establish its defamation claim, Appellant was required to prove that the Better Business Bureau published its statements with actual malice. Because the trial court instructed the jury that this precise level of fault was required for recovery, albeit on an erroneous basis, the trial court's error was harmless.

Accordingly, we affirm.

Former Justice NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY and Justices CASTILLE, EAKIN and BAER join the opinion.

Justice BALDWIN files a concurring opinion.

Justice BALDWIN, concurring.

While I join the majority's result and agree to affirm, I would affirm the Superior Court's analysis of the conditional privilege, rather than relying on the limited-purpose public

figure analysis reached by the majority. Justice Saylor, writing for the majority, in reliance on *Williams v. Kroger Grocery Baking Co.*, 337 Pa. 17, 10 A.2d 8 (1940) and *Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 324, 485 A.2d 374, 385 (1984), *rev'd on other grounds*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), concludes that the concept of common law conditional privilege may no longer alter the level of fault that a defamation plaintiff must prove in order to recover compensatory damages, and that ordinary negligence is sufficient for liability to attach where the plaintiff is a private figure. Majority op. at 79–81, 923 A.2d at 397–98. The majority indicates that "the concept of a conditionally privileged occasion embodying the negligence standard" has been rendered superfluous by the application of the First Amendment to defamation law. *Id.* at 81, 923 A.2d at 398. Such a conclusion fails to take into consideration the public policy reasons which gave rise to the conditional privilege originally and unnecessarily eliminates the heightened protection historically afforded by the recognized common law conditional privileges.

"A privileged communication is one made upon a proper occasion, from a proper motive in a proper manner and based upon reasonable and probable cause." *Baird v. Dun and Bradstreet*, 446 Pa. 266, 275, 285 A.2d 166, 171 (1971). "The basis of the defense of privilege is public policy. That is, conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation." *Corabi v. Curtis Pub. Co.*, 441 Pa. 432, 451, 273 A.2d 899, 909 (1971) (citations omitted). *See also Elia v. Erie Ins. Exchange*, 430 Pa.Super. 384, 392, 634 A.2d 657, 660 (1993) ("Examples of such occasions giving rise to conditional privileges are: (1) when some interest of the publisher of the defamatory matter is involved; (2) when some interest of the recipient of the matter, or a third party is involved; or (3) when a recognized interest of the public is involved.").

The concept of privileged communications evolved under Pennsylvania common law when the law of defamation pre-

sumed the defamatory statement to be false, placing on the defendant the burden of proving that it was true. In addition to demonstrating the truth of the statements, the defendant was permitted to avoid liability by asserting the defense of privilege to make the statements. *Corabi*, 441 Pa. at 452, 273 A.2d at 909. Unless the defendant demonstrated that the statement came within some legal privilege, the statement was presumed to have been made with malice. Once the defendant had pled and proved the elements of privilege, it became the plaintiff's burden to prove that the statements were made with actual malice. *Sprague v. Walter*, 518 Pa. 425, 441 n. 8, 543 A.2d 1078., 1086 n. 8 (1988).

The United States Supreme Court has since abrogated states' ability to assign liability without fault, which had required the defendant to bear the burden of proving the truth of its assertions. In so doing, this jurisprudence has significantly affected the extent and necessity of the common law conditional privilege. However, while the conditional privilege in its historical form has been abrogated, I disagree with the majority that it has lost all of its significance.

In *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the United States Supreme Court held that public officials or public figures could not recover damages for a defamatory falsehood absent proof that the statement was made with "actual malice," that is, that it was made with knowledge of or reckless disregard for the falsity of the statement.

With respect to defamatory falsehoods regarding public officials or public figures, the courts of this Commonwealth routinely apply the *New York Times* standard requiring a showing of actual malice. *See Sprague*, 518 Pa. at 437, 543 A.2d at 1084; *Ertel v. Patriot–News Co.*, 544 Pa. 93, 100, 674 A.2d 1038, 1041 (1996). Consequently, with respect to public officials or public figures, the common law conditional privileges have lost their value because the constitutional protection set forth in *New York Times* requiring actual malice gives at least as much protection as the common law conditional

privilege. As such, with respect to plaintiffs who are public figures or public officials, I agree with the majority that the conditional privilege has lost its significance.

With respect to private-figure plaintiffs, the United States Supreme Court has determined that when the defamatory falsehood is injurious to a private individual, the states may define for themselves the appropriate standard of liability so long as they do not impose liability without fault. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 324, 94 S.Ct. 2997, 2999, 41 L.Ed.2d 789 (1974). Accordingly, the majority in the instant case, in reliance on *Gertz,* concludes that if a private-figure plaintiff is to maintain any cause of action at all he must at a minimum establish negligence on the part of the publisher, since there can be no liability without fault. Majority op. at 83, 923 A.2d at 400. The majority then reasons, however, that in light of *Gertz,* the conditional privileges have lost their significance even with respect to private-figure plaintiffs. Relying on *Kroger* and *Hepps,* the majority finds that the standard for overcoming a conditional privilege is still negligence. If a conditional privilege can be defeated by a showing of negligence, the privilege no longer serves any purpose since, according to *Gertz,* private-figure plaintiffs must necessarily establish negligence in order to maintain any cause of action. *Hepps,* 506 Pa. at 324, 485 A.2d at 385. I disagree with this holding and would instead find that where the plaintiff is a private figure and the matter falls within one of the recognized conditional privileges, the level of fault may be elevated from negligence to actual malice.

In *Hepps,* we indicated in *dicta* and in reliance on a comment to the Restatement (Second) of Torts, that "[i]f a private figure plaintiff is to maintain any cause of action at all, he must minimally establish the negligence on the part of the publisher. In so doing, 'he has by that very action proved any possible conditional privilege was abused.'" *Hepps,* 506 Pa. at 324, 485 A.2d at 385. This Court's statement in *Hepps* rests upon an incomplete analysis of case law and the Restatement (Second) of Torts and can hardly be said to constitute an

affirmative holding that in all circumstances, conditional privileges are overcome by a showing of negligence.

The comment to the Restatement on which *Hepps* relies commences with an analysis of the conflict created by the fact that prior to *Gertz,* the Restatement (First) of Torts had recognized negligence as sufficient to overcome a conditional privilege. The comment acknowledges that *Gertz* required all plaintiffs to demonstrate negligence, at a minimum, in order to sustain a cause of action and thus many traditional conditional privileges may be defeated without a change in the level of fault that must be demonstrated. However, the comment additionally indicates that:

> One important effect of this is that courts will be more cautious in holding that a conditional privilege exists. Under circumstances when the court feels that the defendant should be held liable for defamation if he is merely negligent, as distinguished from being reckless, then it should hold that a conditional privilege does not exist in the particular situation. It will thus fully accomplish its purpose of holding the defendant liable if he was negligent.

Restatement (Second) of Torts, Special Note to Topic 3, Title A, Conditional Privileges and the Constitutional Requirement of Fault (1977). Clearly, if the negligence standard is applied to determine abuse of a conditional privilege, then conditional privileges no longer have any effect. However, as the Restatement (Second) of Torts acknowledges:

> One consequence of this holding [*Gertz*] is that mere negligence as to falsity, being required for all actions of defamation, is no longer treated as sufficient to constitute abuse of a conditional privilege. Instead, knowledge or reckless disregard as to falsity is necessary for this purpose....
>
> The courts will now find it necessary to reassess the circumstances under which it is appropriate to grant a conditional privilege. If a proper adjustment of the conflicting interests of the parties indicates that a publisher should be held liable for failure to use due care to determine the truth of the communication before publishing it [i.e., negligence], a

conditional privilege is not needed and should not now be held to apply. The conditional privilege should be confined to a situation where the court feels that it is appropriate to hold the publisher liable only in case he knew of the falsity or acted in reckless disregard of it [i.e., actual malice]. Restatement (Second) of Torts § 599 cmt. d. (1977).

Contrary to the determination of the majority that the conditional privilege of a private defendant speaking on matters of public concern is defeated by a showing of negligence and therefore without effect, I would hold instead that where the plaintiff is a private figure and the statements fall within some recognized common law privilege, i.e., are in furtherance of some interest of social importance, the conditional privilege may apply to elevate the level of fault required to actual malice.[1] Indeed, the United States Supreme Court, acknowledging the varying degrees of constitutional value of certain forms speech, has observed that speech involving matters of public concern has greater constitutional value than speech concerning matters of purely private concern. *Dun Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 750, 105 S.Ct. 2939, 2940 (1985). Where a defendant makes a privileged statement about a private-figure plaintiff, but the statement relates to a matter of social importance, such speech should be afforded the heightened constitutional protection of a conditional privilege. In the instant case, I would agree with Superior Court and the trial court that the defamatory statement at issue touched upon a matter of social importance and was made on a "proper occasion, from a proper motive in

---

1. This Commonwealth has historically permitted some conditional privileges to be defeated upon a showing of actual malice. *See e.g. Dempsky v. Double,* 386 Pa. 542, 547, 126 A.2d 915, 917 (1956); *Biggans v. Foglietta,* 403 Pa. 510, 512, 170 A.2d 345, 346 (1961) (if the court determines that the alleged defamatory publication is privileged and there is no intrinsic or extrinsic evidence of malice, the court has a duty to direct a nonsuit or give binding instructions for the defendant); *Corabi,* 441 Pa. at 452, 273 A.2d at 909 ("[I]f the privileged occasion is but a qualified one and it be shown that defendant was actuated by malice, the defense of qualified privilege is vitiated."). Therefore, it would not be contrary to established precedent to require an actual malice standard for a private-figure plaintiff to overcome a conditional privilege.

a proper manner and based upon reasonable and probable cause." *Baird,* 446 Pa. at 275, 285 A.2d at 171.

Thus, while I agree with the majority that the appropriate standard for a private-figure plaintiff is, generally, to prove that the defamatory matter was published with negligence, as the Restatement (Second) of Torts § 599 comment d suggests, I would leave the courts with the option of assessing the circumstances under which it is appropriate to grant a conditional privilege to elevate the level of proof that the plaintiff must overcome to actual malice. Such circumstances where a conditional privilege may apply would include situations in which there are private-figure plaintiffs and matters of social importance.[2]

**2.** For additional situations in which the conditional privilege may apply to elevate the level of fault, *see* Restatement (Second) of Torts § 594 (Protection of the Publisher's Interest); § 595 (Protection of Interest of Recipient or a Third Person); § 596 (Common Interest); § 597 (Family Relationships); § 598 (Communication to One Who May Act in the Public Interest) (1977). *See also MacRae v. Afro–American Co.,* 172 F.Supp. 184, 188 (1959) ("Proper occasions, which give rise to a conditional privilege, are classified ... as follows: (1) situations in which some interest of the person who publishes the defamatory matter is involved, (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved, and (3) situations in which a recognized interest of the public is involved.").