J-A16017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| JEFFREY THOMPSON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| THE PENNSYLVANIA STATE | : | No. 1460 MDA 2022 |
| UNIVERSITY | : | |

Appeal from the Order Entered September 21, 2022
In the Court of Common Pleas of Centre County Civil Division at No(s):
2017-1270

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: NOVEMBER 28, 2023**

Appellant, Jeffrey Thompson, appeals from the order entered on September 21, 2022, in the Court of Common Pleas of Centre County, granting summary judgment in favor of The Pennsylvania State University ("PSU"). After careful review, we affirm.

The trial court provided a detailed recitation of the facts and procedural history of this matter, which we need not reproduce herein.  *See* Trial Court Opinion and Order ("TCOO"), 9/21/22, at 1-6.  Briefly, Mr. Thompson was hired as the head coach of PSU's women's gymnastics program ("WGP") in 2010, pursuant to a written employment agreement.  *Id.* at 2-3.  In 2011, PSU reprimanded Mr. Thompson for his violations of the PSU Policy, which protected students' right to privacy, and warned him that "further misconduct could lead to additional discipline or even termination."  *Id.* at 2.  After several

anonymous letters criticizing Mr. Thompson's performance with respect to the WGP and his treatment of the gymnasts, an investigation was conducted by the Deputy Director of Athletics. *Id.* at 3. The Academic Advisor and two senior members of the women's gymnastics team denied the validity of the allegations against Mr. Thompson. *Id.*

In May of 2015, Mr. Thompson entered into a second written employment agreement with PSU, which went into effect immediately upon the expiration of the first employment contract. *Id.* This contract defined "for cause" termination as including, but not limited to, violations of the National Collegiate Athletic Association ("NCAA"), Big Ten, and PSU policies; failure to cooperate with supervisory authorities; and other misconduct. *Id.* In December of 2015, after PSU's investigation of multiple anonymous complaints concerning the WGP, disciplinary letters were placed in Mr. Thompson's personnel file, and he was warned that "future misconduct could result in further disciplinary action up to and including termination." *Id.* at 4. In February of 2017, the assistant coaches of the WGP expressed concerns regarding Mr. Thompson's conduct. *Id.* at 5. Subsequently, the Title IX Coordinator met with PSU's Athletic Director to discuss Title IX violations and prior misconduct by Mr. Thompson. *Id.* at 5-6. Mr. Thompson was terminated on February 23, 2017, "for cause." *Id.* at 6.

On July 27, 2017, Mr. Thompson filed a complaint against PSU, alleging defamation, false light, and breach of contract. ***See generally*** Complaint, 7/27/17. After the denial of its preliminary objections, PSU filed an answer

with new matter on December 17, 2018. Mr. Thompson filed a reply to PSU's new matter on January 29, 2019. TCOO at 1; PSU's Brief at 3. On July 11, 2022, PSU filed a motion for summary judgment. TCOO at 1. Following the submission of briefs and oral argument, the trial court entered an order on September 21, 2022, granting summary judgment in favor of PSU and dismissing all claims brought by Mr. Thompson against PSU. *Id.* at 14.

Mr. Thompson filed a timely appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On November 2, 2022, the trial court issued an opinion in compliance with Rule 1925(a), indicating that the issues raised by Mr. Thompson were addressed in its September 21, 2022 opinion. On appeal, Mr. Thompson presents the following sole issue for our review: "Whether the trial court committed an error of law when it granted [PSU's] motion for summary judgment when [Mr. Thompson] adduced evidence of actual malice in support of his defamation and false light invasion of privacy claims." Mr. Thompson's Brief at 4 (cleaned up).[1]

Our standard of review of an order granting or denying summary judgment is well-settled:

> We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter

---

[1] Mr. Thompson does not challenge the trial court's granting of summary judgment regarding his breach of contract claim against PSU.

of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016) (citation omitted).

Mr. Thompson essentially argues:

Had the trial court reviewed the evidentiary record in the light most favorable to [him] and resolved all doubt as to the existence of a genuine issue of material fact against [PSU], [PSU's] motion for summary judgment on [Mr. Thompson's] defamation and false light claims should have been denied. The trial court's reason for granting summary judgment, *i.e.*, that [Mr. Thompson] adduced no evidence of actual malice was a clear error and misapplication of the law.

Mr. Thompson's Brief at 19.

In reviewing Mr. Thompson's arguments, we have considered the briefs of the parties, the certified record, and the applicable law. We have also assessed the detailed and well-reasoned opinion of the Honorable Jonathan D. Grine of the Court of Common Pleas of Centre County. Judge Grine's opinion thoroughly explains his basis for granting PSU's motion for summary judgment. **See** TCOO at 7-14. Specifically, Judge Grine addresses Mr. Thompson's assertion that the court erred in granting summary judgment with respect to the defamation and false light claims; he concludes that Mr. Thompson failed to show a genuine issue of material fact regarding these two claims. **See id.** at 7-10. Judge Grine's decision is supported by ample, competent evidence in the record, and we discern no error of law or abuse of

- 4 -

discretion. Accordingly, we adopt his opinion as our own, and we affirm the order granting summary judgment in favor of PSU.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/28/2023

# APPENDIX A

**Opinion and Order of the Court of Common Pleas dated September 20, 2022**

IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA

CIVIL ACTION

JEFFREY A. THOMPSON
      Plaintiff,

    V.                 :    NO. 2017-1270

THE PENNSYLVANIA STATE
UNIVERSITY
      Defendant.

*Attorney for Plaintiff:*      Thomas B. Anderson, Esq.
*Attorney for Defendant:*     John A. Snyder, Esq.

## OPINION AND ORDER

Presently before the Court is The Pennsylvania State University's ("Defendant") Motion

for Summary Judgment. Based upon the relevant case law and legal conclusions outlined herein,

the Court grants Defendant's Motion for Summary Judgment in full for Plaintiff's claims of

Defamation, False Light and Breach of Contract.

## PROCEDURAL HISTORY

Plaintiff filed a complaint against Defendant on July 27, 2017, alleging Defamation,

False Light, and Breach of Contract. On August 16, 2018, Defendant filed preliminary

objections, which this Court denied in its October 25, 2018 Order and Opinion. On July 11,

2022, Defendant filed the Motion for Summary Judgement referenced above.

NOTICE OF ENTRY OF ORDER OR DECREE, PURSUANT TO PA RCP 236 NOTIFICATION. THS DOCUMENT HAS BEEN FILED IN THIS CASE.

PROTHONOTARY. CENTRE COUNTY, PA.

R-003013·2022

RECEIVED
OCT 17 2022
By: ......................

☒O ☐RD ☐S

## FACTUAL HISTORY

Defendant hired Plaintiff to become the Head Coach of Penn State University's ("PSU") Women's Gymnastics team in 2010. Plaintiff's wife, Rachelle Thompson, was hired as Assistant Coach. Plaintiff was in charge of directing, developing, and implementing the women's gymnastics program (the "WGP") at PSU. Plaintiff's duties included: program management; compliance with University, Big Ten and the National Collegiate Athletics Association (the "NCAA") rules, regulations, and policies; recommendation and supervision of WGP staff and assistant coaches; teaching, training, counseling, and advising student athletes; and recruiting and public relations.

In late December 2011, Plaintiff and his wife were the subject of an investigation conducted by Vice President and Provost for Affirmative Action Kenneth Lehrman ("Dr. Lehrman"). Dr. Lehrman investigated claims that had been made by the parents of a gymnast asserting that Rachelle Thompson had engaged in behaviors that caused mental distress and anguish to the gymnast. Dr. Lehrman spoke with the affected gymnast, Plaintiff and his wife, several other members of the WGP, a member of the Mens' Gymnastics team, and the head Coach of the Mens' Gymnastics team. Dr. Lehrman concluded that both Plaintiff and his wife were responsible for violations of the PSU Policy, which protected students' rights to privacy, by Rachelle Thompson's interference in a student athlete's sexual relationship and Plaintiff's failure to stop such conduct.

As a result of the 2011 investigation, Defendant sent letters of reprimand informing Plaintiff and his wife there would be close and continuing monitoring of the WGP and further misconduct could lead to additional discipline or even termination. In 2012, Plaintiff signed

2                                                          R.003510a

documents certifying that he would abide by PSU's Code of Conduct for Intercollegiate Athletics (the "Code of Conduct").

In 2014, Defendant received several anonymous letters. These letters criticized the performance of Plaintiff and his wife with respect to the WGP. They included accusations of verbal and mental mistreatment; forcing gymnasts to train and compete while injured; bullying gymnasts about their weight; intimidation by threatening to withdraw scholarships and dismiss gymnasts from the team; intimidating support staff such as trainers and academic advisors; and causing low morale among the team. The letters called for an investigation and, in some instances, for Defendant to remove Plaintiff and his wife as coaches. The then-Deputy Director of Athletics, Charmelle Green ("Green") investigated these complaints by interviewing the Academic Advisor and two senior members of the team, all of whom denied that the complaints were valid.

In August of 2014, Sandy Barbour ("Barbour") was hired as Athletic Director at Penn State. In November 2014, Defendant received additional anonymous letters, similar to the prior anonymous complaints, which did not provide any further details. Defendant did not undertake investigations based on those additional letters.

On May 26, 2015, Plaintiff and Defendant entered into a second written employment agreement that was to go into effect immediately upon the expiration of Plaintiff's first employment contract. The subsequent employment period was July 1, 2015, through June 30, 2018. The rights of termination, set forth in Item #7 of Exhibit E of Plaintiff's Answer and Counterstatement of Material Facts, includes a definition of "for cause" termination. This includes, but is not limited to, violations of NCAA, Big Ten, and Penn State policies, failure to cooperate with supervisory authorities, and other misconduct. If Defendant were to terminate

Plaintiff for cause, Plaintiff would only be entitled to compensation earned, but not yet paid, compared to the additional payment equal to half of his base salary for the remainder of the contract term for termination without cause.

In August, 2015, Plaintiff recommended Defendant hire Samantha Brown ("Brown") as an Assistant Coach for the GWP, which Defendant later did. Conflicts arose between Plaintiff and Brown over their coaching styles. Plaintiff later brought up documented complaints concerning Brown to the Athletics Department Administrator, Phillip Esten ("Esten"). Esten also met with Brown, who discussed a number of concerns with Plaintiff's coaching, including the amount of confrontation with the athletes; the ambiguity of whether the Plaintiff or his wife was the Head Coach; calling a student athlete a "pussy"; and ignoring the mental health issues of student athletes.

On December 7, 2015, Esten met with Deputy Director of Athletics Lynn Holleran ("Holleran") and Athletics Integrity Officer Julie Del Giorno ("Del Giorno") to discuss three anonymous hotline complaints concerning the WGP. Later that day, Esten told Plaintiff that WGP was "under review". On December 9, 2015, Del Giorno and Investigations Specialist Jeff Bowman ("Bowman") began their investigation into the December hotline complaints.

On December 18, 2015, Esten and Assistant Director Andrea Wickerham ("Wickerham") met with Plaintiff and his wife to address the concerns raised by Brown. Wickerham also held disciplinary meetings with Plaintiff and his wife individually. Following the meeting, disciplinary letters were placed in Plaintiff's personal file on December 22, 2015 and Plaintiff was warned that future misconduct could result in further disciplinary action up to and including termination.

R.003512a

On January 11, 2016, Defendant terminated Brown as Assistant Coach. Shortly after Brown's termination, a series of media stories were published that were largely critical of Plaintiff. On May 5, 2016, Pennlive published an article titled "Penn State Gymnasts Accuse Coaches of Mocking their Weight, Prying Into Personal Lives; 8 Leave Team." In the article, the Pennlive reporter wrote that Barbour, who said she would speak on Plaintiff's behalf, stated "They are aware of the fact that these allegations have been made. . . . They are cooperating fully and look forward to learning how they can improve." Plaintiff's Answer and Counterstatement of Material Facts, Exhibit D. Barbour also said: "the university puts significant resources into investigating claims of abuse and reiterated that nothing the department learned about the Thompsons in years past warranted severe reprimanding." Id.

In June, 2016 Esten completed his end of season review of the 2015-2016 WGP season. The review process included an anonymous fall 2015 WGP Athlete Survey as well as spring 2016 end of season reviews completed with all members of the WGP team. In the results, one of the thirteen team members felt the program exceeded expectations and six of the gymnasts felt the program fell below expectations. Six gymnasts rated Plaintiff as "poor" or "fair". Ten of the thirteen gymnasts felt there was "unreasonable pressure" to compete in voluntary activities. On May 20, 2016, Rachelle Thompson announced her intention to resign as Associate Head Coach, Women's Gymnastics. Plaintiff remained as Head Coach and Kera Molinaro ("Molinaro") and Josh Nilson ("Nilson") were hired as Assistant Coaches for the 2016-2017 season.

On February 19, 2017, Esten attended an away meet in Texas. On the return trip, Molinaro and Nilson asked to meet with Esten to discuss their concerns regarding the WGP, Plaintiff, and the things Plaintiff had done contrary to what Defendant asked him to do. This conduct included statements concerning athletes' bodies and sexual relationships. On February

5

22, 2017, Title IX Coordinator Paul Apicella ("Apicella") met with Molinaro and Nilson to discuss Plaintiff's conduct. On February 23, 2017, Esten and Apicella met with Plaintiff to review his conduct. Following that meeting, they met with Bardour to discuss Title IX violations and prior misconduct. Bardour terminated Thompson on February 23, 2017. The termination letter stated the firing was "for cause". After termination, Plaintiff applied for approximately 13 NCAA Division I positions at various institutions. On June 27, 2017, Plaintiff accepted an offer of employment from a family friend and is currently employed at Pearland Gymnastics Academy in Pearland, Texas.

## DISCUSSION

A party may move for summary judgment as a matter of law if, after completion of discovery relevant to the motion, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action. Pa. R.C.P. 1035.2. "The movant bears the burden of establishing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law...in addition, the moving party may meet its burden of showing an absence of material issues by demonstrating that there is an absence of evidence to support the nonmoving party's case." *Becker v. Tenenbaum-Hill Associates, Inc.*, 914 F.2d 107, 110 (7th Cir. 1990).

To survive a motion for summary judgment, the non-moving party "must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." *Ertel v. Patriot-News Co.*, 674 A.2d 1038, 1042 (Pa. 1996). Non-moving parties seeking to avoid the entry of summary judgement may not establish an issue of fact or rebut the movant's evidence through reliance on the mere allegations

6

or denials contained in their pleadings. *See* Pa. R.C.P. No. 1035.3(a); *Briggs v. SW Energy Production Co.*, 657 Pa. 38, 224 A.3d 334, 336 (Pa. 2020). In ruling on a Motion for summary judgment, "the court must examine the record in the light most favorable to the nonmoving party." *Zimmerman v. Zimmerman*, 469 A.2d 212, 213 (Pa. Super. 1983).

A trial court is not bound by its earlier ruling on preliminary objections when considering a motion for summary judgement in the same case. *Neidert v. Charlie*, 143 A.3d 384, 391 (Pa. Super. 2016). The Court notes that, despite its October 25, 2018 Order and Opinion dismissing Defendant's Preliminary Objections on these claims, the standard now is whether Plaintiff has successfully shown evidence of a dispute of material fact, not the standard for Preliminary Objections of whether, on the facts averred, the law says with certainty that no recovery is possible. *Assoc. of Settlement Cos. V. Dept. of Banking*, 977 A2d 1257, (Pa. Comm. Ct. 2009).

## I.    DEFAMATION AND FALSE LIGHT

The classification of a plaintiff as a public or private figure is a question of law to be determined initially by the trial court. *See Am. Future Sys., Inc. v. Better Business Bureau of E. Pa.*, 592 Pa. 66, 76 (2007) (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 938 (3d. Cir. 1990)). A general-purpose public figure is an individual who occupies a position of fame or notoriety in the community through extensive involvement in the affairs of society. *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed. 2d 780 (1974). Alternatively, a limited-purpose public figure is one who voluntarily injects himself or is drawn into a particular controversy and thereby become a public figure for a limited range of issues. *Am. Future Sys., Inc., supra*, 592 Pa., at 84. A public controversy must be a real dispute where

7

the outcome affects the general public or some segment of the public in an appreciable way. *Rutt v. Bethlehems' Globe Pub Co.*, 335 Pa. Super. 163, 181, 484 A.2d 72, 81 (1984). This controversy may be created by the plaintiff's own actions. *Id.*

A plaintiff's choice of a "profession which draws him regularly into regional and national view," "leads to fame and notoriety in the community," or "voluntarily assume[s] a position that invite[s] attention," such as athletes and coaches, may make a plaintiff a public figure. *See generally, Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967) (Where a University of Georgia athletic director and former head football coach, who was well known and respected in coaching ranks, was a public figure because he "commanded a substantial amount of independent public interest at the time of the publications" and "may have attained that status by position alone . . ..").

Here, Plaintiff was the Head Coach of the Women's Gymnastics Program at PSU. Plaintiff was the 2003 and 2008 Southeastern Conference (SEC) Coach of the Year, the 2008 NCAA Regional Coach of the Year, and "one of only three coaches to take two different schools to the National Championships." (SMF, ¶10; J. Thompson Dep., 36:21-25). Plaintiff's position, performance in that role, and the program itself, identify Plaintiff as a public figure and, as such, the allegations by students and parents that led to this controversy are subjects of public interest in the local community, as well as nationally. Therefore, Plaintiff is at least a limited-purpose public figure.

Additionally, Courts regard speech on matters impacting educational institutions and their athletic programs as matters of public concern. *See generally, Curtis Pub. Co. v. Butts, supra,* at 154. The statements at issue here involve prepared statements, press releases, and remarks by Barbour in media interviews responding to media inquiries seeking comment on

8

allegations of mistreatment of student athletes by their coaches. These are legitimate and newsworthy matters of public concern that are of interest to the community.

Where "the plaintiff is a public figure or official, . . . or the statements relate to a matter of public concern, then to satisfy First Amendment strictures[,] the plaintiff must establish that the defendant made a false and defamatory statement with actual malice." *Am. Future Sys. Inc.. supra*, 592 Pa., at 83-83. This standard applies to the claim of Defamation as well as the claim of False Light. *See Seale v. Gramercy Pictures*, 964 F. Supp. 918, 924 (E.D. Pa. 1997); *see also Time, Inc. v. Hill*, 385 U.S. 374, 389, 87 S. Ct. 534, 17 Ed. 2d 4456 (1967).

As Plaintiff is a public figure and the allegations here involve matters of public concern, the relevant standard is whether the statement was made with actual malice. *Am. Future Sys., Inc., supra*, 592 Pa., at 83-84. A statement made with actual malice is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v Sullivan*, 376 U.S. 254, 279 (1964). "Mere negligence or carelessness is not evidence of actual malice . . .." *Coleman v. Ogden Newspapers, Inc.*, 2016 Pa. Super. 136, 142 A.3d 898, 911 (Pa. Super. 2016).

The statement at dispute here (the "Statement") is Barbour's statement to Pennlive in its May 5, 2016 article titled "Penn State Gymnasts Accuse Coaches of Mocking their Weight, Prying Into Personal Lives; 8 Leave Team." In the article, Barbour stated "[t]hey are aware of the fact that these allegations have been made. . . . They are cooperating fully and look forward to learning how they can improve." Plaintiff's Answer and Counterstatement of Material Facts, Exhibit D. This is the only statement by Defendant Plaintiff claims has a defamatory nature and depicts Plaintiff in a false light.

9

Plaintiff has offered no evidence that Barbour made the Statement with actual malice, that is, with knowledge of its falsity or reckless disregard of its falsity. Additionally, the Statement is not explicitly false. Esten, Green, Barbour, and others met with Plaintiff to discuss allegations and complaints at various times, including 2014 through 2016. Plaintiff was aware of the allegations. Although the Statement did not absolve Plaintiff of all allegations, Green's 2014 investigation only concerned the complaints made in 2014 and Barbour did not have knowledge of whether the complaints made in 2015 and 2016 had merit. Therefore, the Statement was not false. Additionally, the Statement is merely Barbour's perception of Plaintiff's actions and reflects a positive view of the investigation, which, even if seen as a misperception and ambiguous, do not rise to the level of actual malice. The fact that Plaintiff did not tell Barbour that he was "cooperating fully" and was "look[ing] forward to learning how [he] can improve" is irrelevant. Even if an individual could take it in a negative way, it was not a false statement. Moreover, actual malice is a subjective standard and Plaintiff has failed to produce anything from the record to indicate Barbour had actual malice in making the Statement. Defendant's failure to adopt Plaintiff's preferred message is not actionable defamation or false light. Therefore, under the standard of actual malice, Plaintiff has failed to show a genuine issue of material fact on his claims of Defamation and False Light.

## II.    BREACH OF CONTRACT

Three elements are needed to sustain Plaintiff's claim of Breach of Contract: "(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract, and (3) resultant damages." *Meyer, Darrach, Buckler & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 635 Pa. 427, 137 A.3d 1247, 1258 (Pa. 2016). Here, neither party

R.003518a

disputes the existence of the contract. Instead, Plaintiff is alleging Defendant breached the contract by terminating his employment without cause.

The definition of "cause" for termination is outlined in Item #7 of Plaintiff's Answer and Counterstatement of Material Facts, Exhibit E, where it states:

"c. Cause. The University may terminate this Contract for Cause. "Cause" as used in this contract includes, but is not limited to the following:

(i)     Deliberate and serious violation of NCAA or Big Ten Conference Rules, Regulations or Legislation by Employee [. . .]

(iv)     A violation by Employee of any policy of the University involving dishonesty, moral turpitude or conflict of interest, or any other personal conduct that materially impairs Employee's ability to fulfill his assigned duties or reflects adversely on Employee's fitness to serve as head women's Gymnastics coach;

(v)     Refusing or failing to comply with the directions of Director of Athletics or any other person with supervisory authority over Employee in good faith and to the best of Employee's abilities, after notice to Employee of the University's expectations; [. . .]

(vii)     Willful misconduct by Employee;

(viii)     Any other action or conduct of Employee which, to a material extent, reflects adversely on the good name and reputation of the University.

Plaintiff's Answer and Counterstatement of Material Facts, Exhibit E, 7-8

11

R.003519a

The record shows a history of allegations of misconduct from as early as 2011 and continuing until Plaintiff's termination. Plaintiff met with Esten, Green, Bardour and multiple other employees to discuss the allegations, remedial actions, and consequences. Plaintiff received letters in 2011 and 2016, stating that further misconduct could result in termination. Additionally, Plaintiff admitted at his deposition his consistent show of disrespect for the team members to the athletes and others with demeaning comments, such as:

a. In discussing the relationship of a gymnast he believed was overweight; "Good, maybe [her boyfriend] will fuck some of the fat off of her." (Def. App. P. 835, N.T. 152:6-7);

b. Asking if gymnasts "were on their periods." (Def. App. P. 804, N.T. 28:8-16 and p. 805 N.T. 29:10-12);

c. With respect to a gymnast he felt was critical of him, Plaintiff stated "I fucking hate that bitch." (Def. App. P. 835, N.T. 152:16-18);

d. Discussing a gymnast's body in the open gym, Plaintiff stated "she just keeps getting fatter and fatter." (Def. App. P. 804, N.T. 28:7-9);

e. In spotting a gymnast, Plaintiff stated "she likes when I touch her butt." (Def. App. P. 1063, N.T. 365:15-366:20); and

f. Discussing a gymnast with mental health concerns, Plaintiff stated: "I'm thinking she should take a whole week off this week and come back next Monday, as long as you don't think she will leave here and kill herself." (Def. App. P. 837, N.T. 158:3-7).

Plaintiff admitted these and other similar comments in his deposition. Defendant states that these comments and Plaintiff's actions culminated in a negative environment for the WGP and gave Defendant "cause" to terminate Plaintiff's employment. Although the termination letter

12

merely stated Plaintiff was terminated "for cause", both Esten and Barbour stated his termination was due to the negative atmosphere Plaintiff caused in reference to his inappropriate comments. Plaintiff does not provide any precedent to support his position that Defendant needed to put the specific misconduct leading to his termination in the termination letter. Plaintiff now asks the Court to believe Defendant, despite the various instances of misconduct Plaintiff admitted to in the record, merely references those instances as a pretext in order to avoid paying Plaintiff more money. Plaintiff points to nothing in the record to support this position and has "cited no legal authority to support pretext as a viable basis for a breach of contract claim. *See Balmat v. Certainteed Corp.*, No. 04-2505, 2007 WL 4570928, at 9 (E.D. Pa. 2007). After reviewing the record and the Plaintiff's undisputed attitude, actions, and comments concerning the student athletes, the Court finds no reasonable jury could conclude Plaintiff complied with his contractual obligations of fostering a positive relationship with the athletes and avoiding misconduct such as ridiculing and insulting the student athletes.

The Court also notes that Plaintiff incorrectly applies the *Nanty-Glo* rule. The *Nanty-Glo* rule states "the party moving for summary judgement may not rely solely upon its own testimonial affidavits or depositions, or those of its witnesses, to establish the non-existence of genuine issues of material fact." *Dudley v. USX Corp.*, 414 Pa. Super. 160, 606 A.2d 916, 920 (Pa. Super. 1992); *Nanty-Glo v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932). The rule does not apply here, where Defendant supports its motion with admissions of the opposing party and relies on documentary evidence, such as the articles. *See Wells Fargo Bank, N.A. v. Joseph*, 183 A.3d 1009, 1012 (Pa. Super. 2018). Additionally, the rule does not apply where Plaintiff, having the burden of production, fails to state a *prima facie* case and fails to produce evidence of

13

R.003521a

a dispute of material issue of fact. *See Ack. V. Carroll Twp.*, 661 A.2d 514, 516-17 (Pa. Cmwlth. 1995).

As there is nothing in the record to support Plaintiff's claims and show a dispute of material issue of fact and, for the reasons stated above, the Court enters the following order:

## ORDER

AND NOW, this 20 day of September, 2022, after argument on the matter on September 1, 2022 and upon reviewing briefs on the matter, the Court **GRANTS** Defendant's Motion for Summary Judgement in full and Plaintiff's claims are **DISMISSED**.

BY THE COURT,

Jonathan D. Grine, Judge

14                              R.003522a

**Mimi Shento**

| | |
|---|---|
| **From:** | Sheri Geis |
| **Sent:** | Monday, October 30, 2023 12:15 PM |
| **To:** | Diane M. Cutrara; Mimi Shento |
| **Subject:** | A16017-23 Thompson v. PSU |

Hi!  I just finished my memo in the above case.  Lisa & Cory reviewed it.  We are affirming on the trial court's opinion.  I have the record at home with me.  But the opinion is attached to the docketing statement on PACMS (14 pages).  Can you please print it to attach to the memo and then give it to the Judge to review?  Thank you!

Sheri